## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| QUINCY L. ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:07-CV-00647-WHA-TFM |
| | ) | |
| BORAL BRICKS INC. and | ) | |
| SCOTT THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' EVIDENTIARY MATERIALS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendant Boral Bricks Inc. and Defendant Scott Thompson respectfully submit the

following evidentiary materials, Exhibits 1-6, in support of their Motion for Summary Judgment.

| | |
|---|---|
| Exhibit 1 | Excerpts from Deposition of Plaintiff Quincy Alexander and Exhibits |
| Exhibit 2 | Affidavit of David Hay |
| Exhibit 3 | Affidavit of Steve Markovich |
| Exhibit 4 | Affidavit of Scott Thompson |
| Exhibit 5 | EEOC Charge of Discrimination |
| Exhibit 6 | EEOC Dismissal and Notice of Rights |

Respectfully submitted,

LATHROP & GAGE L.C.

 /s/ Jack D. Rowe
Jack D. Rowe        MO#  22996
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri  64108
Telephone:  (816) 292-2000
Telecopier:  (816) 292-2001

CARR, ALLISON, PUGH, HOWARD,
OLIVER & SISSON, P.C.


 /s/ Thomas L. Oliver, II
Thomas L. Oliver, II
100 Vestavia Parkway, Suite 200
Birmingham, Alabama  35216

Attorneys for Defendant s


## CERTIFICATE OF SERVICE

I hereby certify that on this 10th of July, 2008, the foregoing pleading and all Exhibits

thereto were served, by Certified and First Class United States mail, postage prepaid, that same

date to:

Quincy L. Alexander
1507 – 8th Place, South
Phenix City, Alabama  36869

Plaintiff Pro Se


                  /s/ Jack D. Rowe
An Attorney for Defendants

# EXHIBIT 1

# FREEDOM COURT REPORTING

**TRAVEL TRANSCRIPT**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


CASE NUMBER:  CV 3:07-CV-000647-WHA-TFM


QUINCY L. ALEXANDER,

       Plaintiff,

       VS.

BORAL BRICKS, INC., AND SCOTT THOMPSON,

       Defendants.


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF**

**QUINCY ALEXANDER**

**November 30th, 2007**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' M. LANIER, CCR

(334) 300-3832


www.freedomreporting.com

1-877-373-3660

ALEXANDER v BORAL                CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3
4  CASE NUMBER:  CV 3:07-CV-000647-WHA-TFM
5
6  QUINCY L. ALEXANDER,
7        Plaintiff,
8        VS.
9  BORAL BRICKS, INC., AND SCOTT THOMPSON,
10        Defendants.
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED by
14  and between the parties through their
15  respective counsel, that the deposition of
16  QUINCY L. ALEXANDER may be taken before
17  RENA' MESSICK LANIER, Certified Court
18  Reporter and Notary Public for the State
19  of Alabama at Large, at the Chamber of
20  Commerce, 1107 Broad Street, Phenix City,
21  Alabama  36867, on the 30th day of
22  November, 2007.
23        IT IS FURTHER STIPULATED AND

Page 2

1  AGREED that the signature to and the
2  reading of the deposition by the witness
3  is not waived, the deposition to have the
4  same force and effect as if full
5  compliance had been had with all laws and
6  rules of Court relating to the taking of
7  depositions.
8        IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to
11  any questions except as to form or leading
12  questions, and that counsel for the
13  parties may make objections and assign
14  grounds at the time of the trial, or at
15  the time said deposition is offered in
16  evidence, or prior thereto.
17        IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21
22
23

Page 3

1        I N D E X
2  EXAMINATION BY:                PAGE
3  MR. ROWE                        5
4  EXHIBITS                MARKED
5  DEX 1  10/26/07 letter          7
6  DEX 2  Notice of Deposition     7
7  DEX 3  Employment application   82
8  DEX 4  Employee Guidelines     130
9  DEX 5  Acknowledgement of DEX 4  132
10  DEX 6  Alexander statement/claim  175
11  DEX 7  Same of DEX 6 - diff. format  192
12  DEX 8  Notice of Questionnaire  193
13  DEX 9  Charge of Discrimination  217
14  DEX 10  EEOC dismissal of charge  233
15  DEX 11  Complaint              237
16  DEX 12  Deft. First Interrogatories  252
17  DEX 13  Deft First Req. for Prod.  260
18
19
20
21
22
23

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3
4  CASE NUMBER:  CV 3:07-CV-000647-WHA-TFM
5  QUINCY L. ALEXANDER,
6        Plaintiff,
7        VS.
8  BORAL BRICKS, INC., AND SCOTT THOMPSON,
9        Defendants.
10
11  BEFORE:
12        RENA' M. LANIER, Certified Court
13  Reporter and Commissioner
14  APPEARANCES:
15        QUINCY L. ALEXANDER, 1507 - 8th
16  Place, South, Phenix City, Alabama  36869,
17  appearing as Pro Se Plaintiff.
18        LATHROP & GAGE, by JACK D. ROWE,
19  2345 Grand Boulevard, Suite 2800, Kansas
20  City, Missouri  64108, appearing for the
21  Defendants.
22        ALSO PRESENT:  David Hay, Boral
23  Brick corporate representative

ALEXANDER v BORAL          CondenseIt!™          DEPO:QUINCY ALEXANDER

Page 5

1      I, RENA' MESSICK LANIER, a
2  Certified Court Reporter of Elmore County,
3  Alabama, acting as Commissioner, certify
4  that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there
7  came before me at the Chamber of Commerce,
8  1107 Broad Street, Phenix City, Alabama
9  36867, beginning at 9:16 a.m., EDT, QUINCY
10  L. ALEXANDER, witness in the above cause,
11  for oral examination, whereupon the
12  following proceedings were had:
13      QUINCY L. ALEXANDER,
14  the witness, after having first been duly
15  sworn, was examined and testified as
16  follows:
17      EXAMINATION
18  BY MR. ROWE:
19      Q.  Could you state your name
20  for the Record, please?
21      A.  Alexander Lorenzo Alexander.
22      Q.  Have you gone by any other
23  name, Mr. Alexander, other than Quincy

Page 6

1  Lorenzo Alexander?
2      A.  I got a nickname.  Pete.
3      Q.  Pete?
4      A.  Pete, yeah.
5      Q.  It's about 9:20 here on
6  November the 30th.  And we are here to
7  take your deposition in the lawsuit that
8  you've brought against Boral Bricks and
9  Scott Thompson.
10      You're aware of that, are you
11  not?
12      A.  Yes.
13      Q.  Just a couple of things
14  before we really get started into the
15  questions I'm going to ask.  I'm going to
16  be asking quite a few questions today.
17      A.  Okay.
18      Q.  If at any time you don't
19  understand any question I ask, please ask
20  me to repeat it or rephrase it, and I'll
21  be more than happy to do so.
22      A.  Okay.
23      Q.  Because I don't want you to

Page 7

1  answer a question you don't understand,
2  all right?
3      A.  All right.
4      Q.  Also, if at any time you
5  want to take a break, just let, you know,
6  let us know.  This is not a march into the
7  sea or anything.
8      A.  Okay.
9      Q.  It's a time for us to find
10  out about your claims and what you have to
11  say about your case.
12      A.  Okay.
13      (Whereupon, Defendants' Exhibit
14  Nos. 1 & 2 were marked for identification
15  purposes by Mr. Rowe.)
16      Q.  (BY MR. ROWE)  Let me start
17  out by just showing you for the Record
18  what I will have marked as Defendants'
19  Exhibits 1 and 2.
20      Let me show you what's been
21  marked as Exhibit 1.  And that is a
22  letter, a copy of a letter dated October
23  26th, 2007, to you from me advising you of

Page 8

1  your deposition here today; is that
2  correct?
3      A.  Yes, sir.
4      Q.  And you're here pursuant to
5  that letter?
6      A.  Yes.
7      Q.  I'm going to show you what's
8  been marked as Exhibit 2, which is a
9  deposition notice for your deposition here
10  today.
11      And you received that notice,
12  and you're appearing here pursuant to that
13  notice, correct?
14      A.  Yes.
15      Q.  Okay.  And I know that we've
16  had several conversations about your case
17  and also a conversation with the Judge a
18  few weeks ago about your case.
19      And my understanding is that
20  you are representing yourself, and you do
21  not have counsel in this case; is that
22  correct?
23      A.  Yes.

Page 21

1    A.  Yes.
2    Q.  Why did you decide to leave
3  the Army?
4    A.  Medical.  Medical reason.  I
5  had surgery on my right knee while I was
6  in.  And I had surgery on the left knee
7  while I was in.  I had back problems while
8  I was in and a little hearing loss.
9    Q.  Did you receive a medical
10  discharge?  Or did you --
11    A.  No.  No.  No.  No.
12    Q.  -- just decide to leave?
13    A.  I -- I got out.  But after I
14  got out, I had filed for compensation when
15  I got out.  And I started receiving it
16  shortly after I started working with
17  Boral.  I started at forty percent.
18    Q.  When you said you filed for
19  compensation, can you explain that to me?
20    A.  When you get out, when you
21  ETS, they ask you do you want to file for
22  anything -- for compensation for anything
23  while you were in the military.

Page 22

1      And at the time, I had --
2  like I say, I had had surgery on my knees
3  and a little hearing loss.  And, also, I
4  had back problems while I was in.
5    Q.  Okay.
6    A.  I was in a lot of infantry
7  units.
8    Q.  At any time that you were or
9  at the time that you were discharged from
10  the Army, did you have any medical
11  restrictions at all?
12    A.  I was on profile for my
13  knee, for the right knee.  Which in 2000 I
14  had to do surgery on the right knee again
15  for -- from the VA Medical Center in
16  Birmingham.
17    Q.  Yeah.  But you said you were
18  on profile, but you weren't restricted
19  from duty.  You could still perform your
20  duties?
21    A.  Right.  You was on pretty
22  much light duty.  You know, no running,
23  jumping, like stooping or stuff like that.

Page 23

1    Q.  But you did not receive a
2  disability discharge; you decided to leave
3  the Service and receive an honorable
4  discharge?
5    A.  Yes.
6    Q.  Okay.
7    A.  Well, my time was up any
8  way.
9    Q.  Okay.
10    A.  So I just didn't reenlist.
11    Q.  So when you said you filed
12  for compensation when you got out, did you
13  receive any compensation?
14    A.  After I got out.  Shortly
15  after I started working with Boral, I got
16  forty percent disability from the
17  military.
18    Q.  Does that translate into any
19  money?
20    A.  Of course.
21    Q.  Tell me about that.
22    A.  Forty percent is I think
23  like -- at the time I think forty percent

Page 24

1  was like three hundred and ninety-three
2  dollars a month.
3    Q.  Are you still receiving
4  that?
5    A.  Yes.  Have you ever -- other
6  than this -- well, let me back up and ask
7  this question.
8      Have we discussed all the
9  education that you have had?
10    A.  I went to a leadership
11  course while I was at Boral.  A supervisor
12  leadership course.
13    Q.  Okay.  Anything else?
14    A.  I'm not sure.  That's all I
15  can think of.
16    Q.  Okay.  Have you ever been a
17  party to a lawsuit other than this lawsuit
18  that you filed against Boral and Scott
19  Thompson?
20    A.  I've -- well, I think -- I
21  think like for some class action stuff
22  that people just send to your house.
23      But as far as receiving

Page 33

1 what, you know, the name of those pills
2 are.
3    Q.   And you don't know the
4 doctor's name?
5    A.   I'm not sure of his name.
6 We -- we see plenty of doctors through the
7 VA.
8    Q.   When's the last time you saw
9 any health practitioner for this
10 depression you said you had?
11    A.   Like I said, that was
12 earlier this year.
13    Q.   2007?
14    A.   Yes, sir.
15    Q.   When's the last time you saw
16 anybody at the VA for that?
17    A.   For depression?
18    Q.   Yes.
19    A.   That was -- that was the
20 only time.
21    Q.   Okay.  So one time?
22    A.   Yes.
23    Q.   And you were prescribed some

Page 34

1 type of medication?
2    A.   It was -- it was something
3 they said to help you relax or sleep a
4 little bit more.
5    Q.   But some type of medication.
6 And it was that one time, and you haven't
7 been back?
8    A.   Yes.
9    Q.   And you're not taking that
10 medication now?
11    A.   No.  No, I'm not.
12    Q.   What medications are you
13 taking now?
14    A.   The hydrocodone and blood
15 pressure pills.
16    Q.   Hydrocodone?
17    A.   Yes.
18    Q.   And that's for?
19    A.   My back pain and the
20 conditions.
21    Q.   How long have you been
22 taking that?
23    A.   I take it -- it's not a

Page 35

1 daily thing that I do.  It's just when I,
2 you know, probably weather changes and my
3 knees get extreme pain.  That's when I
4 take it.  It's not an every-day thing.
5    Q.   And who prescribes that?
6    A.   The VA.
7    Q.   Do you have any records
8 regarding your visits to the VA for either
9 your knees, back or otherwise?
10    A.   They do.  I mean --
11    Q.   Well, but do you?
12    A.   No.  I just got the
13 medicine, you know.  Also, they just give
14 me -- I went to the VA.
15         I got an appointment on the
16 18th of this -- of next month.  But I went
17 to them probably a month ago, and they
18 gave me a C-PAP machine.
19    Q.   How do you -- C --
20    A.   C-PAP.
21    Q.   What's that?
22    A.   It's for sleep apnea.
23    Q.   Oh.  When was the last time

Page 36

1 you were hospitalized?
2    A.   I was hospitalized probably
3 2001 when I had my surgery.
4    Q.   And what was that for?
5    A.   My right knee.
6    Q.   And what was the problem?
7    A.   I don't have no cartilage
8 in-between the bones.  So they have to --
9 they went in and drilled holes in my knees
10 hoping the cartilage will start to form.
11 But --
12    Q.   Do you have any written
13 restrictions regarding your ability to
14 work with respect to either knee or your
15 back?
16    A.   No.  No.
17    Q.   Okay.  Prior to coming here
18 to give your deposition, Mr. Alexander,
19 did you review any records or documents at
20 all?
21    A.   Did I review any?  What do
22 you mean?  What kind of records?
23    Q.   Any kind.

ALEXANDER v BORAL          CondenseIt!™          DEPO:QUINCY ALEXANDER

| Page 41 | Page 43 |
|---|---|
| 1 It was another guy. | 1    Q.  Have you had any employment |
| 2    Q.  Okay. | 2 since leaving Boral in February of 2006? |
| 3    A.  But I forgot his name. | 3    A.  I had -- I've had DJ gigs. |
| 4    Q.  So one other from Phenix | 4    Q.  Okay.  You want to explain |
| 5 City? | 5 that for me? |
| 6    A.  Yes. | 6    A.  Play records for parties. |
| 7    Q.  You mentioned -- when I | 7    Q.  Okay.  You never know until |
| 8 asked you what medication you were taking, | 8 you ask.  And is that a business you're |
| 9 you mentioned hydrocodone.  And you | 9 in? |
| 10 mentioned also blood pressure medicine? | 10    A.  No.  Just hobby. |
| 11    A.  Yes. | 11    Q.  Do you get paid for doing |
| 12    Q.  What's that? | 12 that? |
| 13    A.  Blood pressure pills. | 13    A.  Probably a hundred and fifty |
| 14    Q.  I know.  But do you know the | 14 dollars a gig. |
| 15 name of it? | 15    Q.  Okay.  And how many gigs |
| 16    A.  Oh, no.  I don't know the -- | 16 have you had? |
| 17 oh, my God.  I was on a certain type of | 17    A.  In all?  Or just -- |
| 18 blood pressure pill, but I forgot the | 18    Q.  Since leaving Boral in |
| 19 name -- those names.  Those names is -- | 19 February. |
| 20 but they changed it, the type.  Well, they | 20    A.  Since leaving Boral, |
| 21 changed the brand I guess.  It's still the | 21 probably -- probably roughly about seven, |
| 22 same pill. | 22 I guess. |
| 23    Q.  Who prescribed that for you? | 23    Q.  And who arranges those? |

| Page 42 | Page 44 |
|---|---|
| 1    A.  The VA. | 1    A.  People just call.  Hear |
| 2    Q.  Do you recall the name of | 2 about you and just give you a call. |
| 3 the physician? | 3    Q.  Is that something, a |
| 4    A.  I see plenty of physicians. | 4 business that you've been in for a period |
| 5 Dr. Kline.  Bruce Kline. | 5 of time even while you were working at |
| 6    Q.  And how long have you been | 6 Boral? |
| 7 taking the blood pressure medication? | 7    A.  We used to -- we used to |
| 8    A.  For years. | 8 just have parties, you know.  I never have |
| 9    Q.  When you say for years, at | 9 just took up saying I want to get a |
| 10 least five or six? | 10 license to DJ or nothing like that. |
| 11    A.  At least -- probably, yes. | 11    Q.  And when you say we, who is |
| 12 Four, five, something. | 12 that you are referring to? |
| 13    Q.  And is your blood pressure | 13    A.  Clyde Davis and I used to |
| 14 under control as a result of the | 14 have parties back in -- well, back when he |
| 15 medication? | 15 was working at Boral. |
| 16    A.  It seems to be. | 16    Q.  When you say you had |
| 17    Q.  So other than the blood | 17 parties, is that something you would |
| 18 pressure medicine, the hydrocodone, | 18 charge admission to? |
| 19 there's no other medications? | 19    A.  Donation.  We don't charge |
| 20    A.  No. | 20 admission because we weren't licensed.  So |
| 21    Q.  Okay.  Are you presently | 21 we did donations and asked for people to |
| 22 working? | 22 donate to help us get food and drinks. |
| 23    A.  No. | 23    Q.  And you'd rent a hall out or |

Page 69

1 that test, I wanted to transfer it from
2 Georgia over to Alabama.
3     Q.  Okay.  But, specifically,
4 you haven't applied for any post office
5 job in Alabama?
6     A.  No.  No.
7     Q.  Okay.  You mentioned that
8 you came from the military to Boral; is
9 that correct?
10     A.  Yes.
11     Q.  Had you had any employment
12 other than the military before you started
13 work at Boral?
14     A.  Have -- say that again.
15     Q.  Okay.  Before beginning work
16 at Boral, other than working for the
17 military, the United States Army, did you
18 have any other employment?
19     A.  I worked at the carwash when
20 I was in probably junior high school.
21 High school or junior high school.
22     Q.  Other than the junior high
23 carwash?

Page 70

1     A.  No.  No.
2     Q.  That's it?
3     A.  No.  Because, see, I got out
4 of the Army in April of '97, and I started
5 with Boral in June of '97.  Between that
6 time I was just looking for a job.
7     Q.  Okay.  So the only
8 employments really you've had are --
9     A.  Boral and the military.
10     Q.  -- with the military and
11 Boral?
12     A.  And Boral.  Yes.
13     Q.  During the time that you
14 worked at Boral, other than possible disc
15 jockey jobs or arranging parties, did you
16 have any other employment?
17     A.  No.
18     Q.  Did you ever seek any other
19 employment while you were working with
20 Boral?
21     A.  At the post office, of
22 course.  I had -- I had an interview with
23 the post office right before I got hired

Page 71

1 with Boral.  Right before I got hired with
2 Boral.
3     But I turned it down because
4 they said it was temporary.  All post
5 office jobs start out temporary.
6     But at the time, I didn't
7 know that all jobs actually start off
8 temporary with the post office.  So I
9 turned it down.  Because I told them since
10 I was just getting out of the military, I
11 needed a full-time job.
12     Q.  So then after you began work
13 at Boral, did you continue to pursue work
14 at the post office?
15     A.  No.
16     Q.  Did you seek any work, any
17 other work while you were employed at
18 Boral?
19     A.  No.
20     Q.  Other than -- well, you
21 mentioned unemployment.  Did you receive
22 unemployment compensation after leaving
23 Boral in February, 2006?

Page 72

1     A.  Yes.
2     Q.  How long did you receive
3 unemployment?
4     A.  I think it was -- I think
5 it's so many weeks.  I'm not sure.
6     Q.  Do you have a record that
7 reflects your unemployment compensation?
8     A.  I mean, they would probably
9 have it at the unemployment office, but I
10 don't.
11     Q.  But I'm just asking what you
12 have.
13     A.  Oh, no, I don't.
14     Q.  You personally.  And how
15 much was your unemployment?
16     A.  I think it was two-ten a
17 week, or one ninety-five a week.
18 Something in that area.
19     Q.  And do you recall how long
20 you received unemployment?
21     A.  I'm not -- I'm not sure how
22 long the duration of time was.
23     Q.  Was it more than six months?

Page 81

1    A.  My uncle is still down there
2  now, I think.  I think that he had got
3  laid off, but I think he got called back.
4    Q.  Okay.  And were Clyde Davis
5  and Seldrick Tarver working there when you
6  went to work there in 1997?
7    A.  Yes.
8    Q.  Okay.  And what relation are
9  they to you?
10    A.  Cousins.
11    Q.  Cousins.  Okay.  And that's
12  the same Clyde Davis that you said you
13  worked at parties with; is that right?
14    A.  Yes.
15    Q.  Earlier in your deposition?
16    A.  We had parties together.
17    Q.  Had parties together?
18    A.  Yes.  You keep throwing that
19  work in there.
20    Q.  Well, I wasn't doing it
21  intentionally.  But that's the same
22  person?  That's what I'm trying to
23  establish.

Page 82

1    A.  Yes.
2    Q.  Okay.  And who is the person
3  who hired you at Boral?
4    A.  David Hay, as far as I know.
5    Q.  Okay.  And what was your
6  first job there?
7    A.  I was sweeping.  I think --
8  what they call it -- floatman or
9  something.  I was sweeping.
10    Q.  And what plant?
11    A.  Plant 1.
12    (Whereupon, Defendants' Exhibit No.
13  3 was marked for identification purposes
14  by Mr. Rowe.)
15    Q.  (BY MR. ROWE)  Let me show
16  you what's been marked as Exhibit 3, which
17  is a document that we've produced -- we
18  being the defendants have produced -- in
19  this case.
20        And the documents which the
21  defendant has produced in this case,
22  Mr. Alexander, are marked at the bottom of
23  the page with a D and then a number.

Page 83

1  That's what those mean.
2    A.  Okay.
3    Q.  And I'll ask you first to
4  take a look at this four-page document,
5  Exhibit 3.  And then I want to ask you a
6  couple of questions about it.
7    A.  (Witness complying.)
8    (Brief pause.)
9    Q.  (BY MR. ROWE)  Okay.  Have
10  you had a chance to take a look at it?
11    A.  Uh-huh.
12    Q.  Is that your a copy of your
13  employment application?
14    A.  It appears to be.
15    Q.  Okay.  Is that your
16  signature that appears on the last page at
17  the bottom of the page?
18    A.  Yes.
19    Q.  And does that look like your
20  printing throughout that application,
21  Exhibit 3?
22    A.  Yes.
23    Q.  I just want to ask you a

Page

1  couple of questions about it.  On page two
2  of Exhibit 3, for education, you reflect
3  that you graduated from Chavala High and
4  also the HAZMAT and hazardous materials
5  training that you've had -- that I think
6  you previously testified to, correct?
7    A.  Yes.
8    Q.  And then on page two, you
9  also indicate at the top of the page that
10  you learned about Boral from Seldrick
11  Tarver, Clyde Davis and Henry Alexander.
12        And those are your
13  relatives --
14    A.  Yes.
15    Q.  -- that you indicated were
16  working there; is that correct?
17    A.  Yes.
18    Q.  Okay.  And Seldrick is
19  S-E-L-D-R-I-C-K?
20    A.  Yes.
21    Q.  Then on page three, you show
22  your previous employment as being with the
23  U.S. Army; is that correct?

ALEXANDER v BORAL          CondenseIt!™          DEPO:QUINCY ALEXANDER

Page 85

1      A.   Yes.
2      Q.   And it reflects here dates
3  employed on page three with the Army from
4  October, 1991, to April of 1997; is that
5  correct?
6      A.   Active duty, yes.
7      Q.   What about between 1989 and
8  October of 1991?  Were you on active duty?
9      A.   Reserves.  We got -- we
10  got -- I went -- I went on a temporary
11  active duty because Saudi Arabia probably
12  like -- we volunteered to go to Fort
13  Stewart, Georgia while I was in the
14  Reserves.  And that's what actually made
15  me go to active duty.
16     Q.   But basically --
17     A.   Or inactive duty.
18     Q.   I guess what you're saying
19  though from your previous testimony from
20  1989 to 1997 you were basically full-time
21  military?
22     A.   Basically.  Basically.
23  Because like I said, once I graduated --

Page 86

1  well, I went to AIT, basic training and
2  AIT from August all the way to December.
3      From there, I came back home
4  being in the Reserves.  But we got
5  activated to go to Fort Stewart.
6      Q.   Okay.  And that makes you
7  full-time once you get activated?
8      A.   That makes you full time.
9      Q.   Did you ever serve overseas?
10     A.   Germany, Korea, Japan,
11  Kuwait.
12     Q.   Okay.  On page four of
13  Exhibit 2 for activities, it lists AMWAY
14  distributor as an activity; is that
15  correct?
16     A.   I tried AMWAY.
17     Q.   Were you an -- are you still
18  an AMWAY distributor?
19     A.   No.  I tried that for a
20  couple of weeks.
21     Q.   Okay.
22     A.   A couple of months probably.
23     Q.   All right.  Well, let's go

Page 87

1  back to Boral.  Your first job was at
2  Plant 1 in sweeping you said.
3      Who was your -- do you recall
4  who your supervisor was at that time?
5      A.   Joe Coleman.
6      Q.   And how long did you remain
7  in that job?
8      A.   I have no idea.  It
9  wasn't -- it wasn't too long.  I think
10  they -- I think when you start, they start
11  like a twenty-five-day grace period of
12  whether you're going to get hired or not.
13     Q.   Okay.
14     A.   And once that happens, you
15  sweep a little bit.  But you probably have
16  to work the job they call the "hole" while
17  you are a sweeper.
18      If the guy take a vacation
19  there or don't show up, you jump in the
20  hole for them.
21      After a while, I got a job as
22  a transfer operator.  I don't know how
23  long it was from the time I was sweeping

Page 88

1  until I got the transfer operator job.
2      Q.   Okay.  Was Mr. -- during
3  this period of time, was Mr. Coleman your
4  supervisor the whole time?
5      A.   Not -- not the entire time.
6  Because Mark -- Mark, a Canadian guy,
7  Mark, I forgot his last name.
8      Q.   And then at some point in
9  time you became employed at Plant 1 in
10  shapes; is that correct?
11     A.   Yes.  Probably -- I would
12  say it took approximately two and a half,
13  maybe three years.
14     Q.   The record that Boral has
15  reflects that it was in August of 1998 you
16  bid to a position in shapes in Plant 1.
17     A.   Okay.
18     Q.   Does that sound about right?
19     A.   The first time I bid for the
20  job, I didn't get it.  The first time I
21  bid for that job.
22     Q.   Okay.
23     A.   The second time I bid, I got

ALEXANDER v BORAL                CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 89

1 it.
2    Q.   The second time you got the
3 position in shapes, it was pursuant to a
4 bid?
5    A.   Yes.
6    Q.   I mean, the second time you
7 bid, you got the job?
8    A.   Uh-huh.  Yes.
9    Q.   And does that sound about
10 right?  August of 1998?
11    A.   I'm -- I'm not sure.
12    Q.   Okay.
13    A.   I'm not sure.
14    Q.   When you -- when you became
15 employed in shapes, what was your
16 position?
17    A.   I think I was a stacker.  I
18 was stacking.
19    Q.   And this was at the shapes
20 at Plant 1?
21    A.   Yes.
22    Q.   Okay.  And how long did you
23 remain as the stacker?

Page 90

1    A.   A couple of years, I
2 suppose.  I'm not sure.
3    Q.   When you were a stacker
4 at -- and this again was at Plant 1?
5    A.   Yes.
6    Q.   In shapes, who was your
7 supervisor?
8    A.   Scott Thompson.
9    Q.   Let's go back to
10 Mr. Coleman, when you were in a laborer or
11 in a sweeping type position --
12    A.   Yes.
13    Q.   -- there and the transfer
14 operator and the other jobs, and
15 Mr. Coleman was your supervisor.
16        Did you have any problems or
17 difficulties with him?
18    A.   I didn't really have
19 problems as far as with Mr. Coleman.
20        At that time, I think Ken
21 Davis -- Ken Davidson, Ken Davis, I think
22 he was the plant manager at that time.
23        And with me -- with me

Page 91

1 having -- then I was making frequent
2 doctor visits.  I was going to the doctor
3 frequently with the VA.
4        And, you know, with me
5 just -- shortly after I got with Boral,
6 that's when they approved my VA
7 compensation.  So I was making frequent --
8 really frequent visits to the doctor.
9        And that -- that was causing
10 problems with Ken.  Because sometimes, you
11 know, I'd have to go through certain pains
12 and stuff like that, and, you know, he
13 didn't -- I guess he didn't believe me.
14        So that's probably where the
15 problem came in at.  It wasn't with Joe
16 Coleman.
17    Q.   Okay.  By my question about
18 Mr. Coleman, I'm not suggesting that you
19 did.  I just need to ask that.
20    A.   Okay.  That's fine.
21    Q.   But then at some point like
22 I said, you were bid to the position in
23 shapes, Plant 1, and Scott Thompson was

Page 92

1 your supervisor?
2    A.   Yes.
3    Q.   And how long did you remain
4 in shapes at Plant 1?
5    A.   The entire time.
6    Q.   Okay.
7    A.   Until they shut down.
8    Q.   What other jobs did you have
9 in shapes other than at Plant 1 other than
10 stacker?
11    A.   I became a lead person.  I
12 started doing inventory.  I ended up being
13 over -- over that in that department.
14    Q.   And when was that?
15    A.   It -- after Thomas left.  I
16 don't know exactly what date Thomas left.
17 But that's when I took over the
18 department.
19    Q.   Who is Thomas?
20    A.   Thomas was -- Thomas was the
21 guy that was over the department.
22 Because, see, Scott got the assistant
23 plant manager's job.  And that's when

ALEXANDER v BORAL                   Condenselt!™                   DEPO:QUINCY ALEXANDER

Page 101

1  machine being down all the time and try to
2  get everything situated.
3          And at that time, Angela was
4  up at the front office.  She was working
5  up there with Scott.  I don't know exactly
6  what her job was.
7          But one day -- well, one day,
8  I'm not sure, someone told me, and I'm not
9  sure who it was that told me, that Neil
10  Ruth asked Angie what she was doing, did
11  she have a job.  And if not, she can go
12  home.
13          Shortly after that, Scott
14  came back and told Clyde and me that he
15  going to put Angie back on the shapes
16  payroll and take some of our -- take some
17  of our responsibilities off us and, you
18  know, let her help us back there.
19          She was going to be over the
20  arch department.
21     Q.  Okay.  And did that happen?
22     A.  As far as I know.
23     Q.  Okay.  And was she also a

Page 102

1  lead in shapes?
2     A.  Yes, at that time.  Like I
3  said, as far as I know, that's how he said
4  he was going to do it.
5     Q.  Okay.
6     A.  But as far as her actually
7  being back there with us, she wasn't back
8  there physically.
9     Q.  As a lead, what did you do
10  as a lead in shapes?
11     A.  Well, to me, I was -- I was
12  more than -- I was over the department at
13  the time.  So I was the supervisor in the
14  shapes department, you know.  Because I --
15  I -- I --
16     Q.  But tell me what you did.
17     A.  I put inventory -- I put in
18  inventory.  I wrote the tickets out.  I
19  received information from Augusta saying
20  what bricks need to be made.  I wrote the
21  tickets out.  Gave the guys the tickets.
22          We also dealt with Huff Wood
23  Products.  We gave Huff the arch on the

Page 103

1  wood, the arches that we want him to -- I
2  guess the basic layout for the arch for
3  him to cut for us.
4          I gave the guys -- everybody
5  that had a job at Boral, I made sure that
6  they do their job.  I mean, everything
7  that dealt with the -- in the shapes
8  department I did.
9     Q.  As a lead, you were -- and I
10  think you've mentioned this earlier.
11  During your entire employment at Boral,
12  you were hourly paid; is that correct?
13     A.  I was hourly.
14     Q.  And as a lead, you didn't
15  have the authority to either hire or fire
16  someone; that was with Scott?
17     A.  No.  Well, at the -- at
18  the -- to what I hear, the supervisor
19  didn't have the authority to hire or fire
20  anybody either.  Only managers can do
21  that.
22     Q.  All right.  And you didn't
23  determine anybody's pay or compensation?

Page 104

1  You didn't do that as lead?
2     A.  No.  No.
3     Q.  And you didn't discipline
4  anybody?  That came from a manager, did it
5  not?
6     A.  Well, I actually -- Scott --
7  we had authority to write somebody up.
8  But at the same time, Scott got the final
9  say-so over it.
10          And, of course, he told me on
11  several occasions to write people up.
12  Like I said, if you write them up and
13  everything, it's just whether he's going
14  to pursue it or whatever.
15     Q.  And you never did
16  performance evaluations on any employee?
17     A.  I don't think nobody got
18  performance evaluations.  I didn't even
19  get a performance evaluation.
20     Q.  Okay.  But you didn't do
21  them on employees as a lead?
22     A.  No.
23     Q.  When you say you wrote

FREEDOM COURT REPORTING    (334) 300-3832                    Page 101 - Page 104

Page 109

1    A.  Pretty much Scott's way or
2  the highway.  I mean, Scott -- at that
3  particular time, Scott just wanted --
4  Scott basically wanted you to, you know,
5  just okay, this is your inventory for the
6  month.  This is what you got.  This is for
7  the month.  That's what I want.
8    Q.  Okay.
9    A.  And I didn't -- I didn't
10  really see that as a problem.  But --
11    Q.  And, again, by my question
12  I'm not suggesting that you did have any
13  problem with him.
14    A.  Yeah.  I mean --
15    Q.  Other than it was his way or
16  the highway on inventory or other matters
17  with business, any other problems or
18  difficulties with him?
19    A.  I mean, not -- not to my
20  knowledge.  Not really.
21    Q.  Okay.  At some point in
22  time -- and I think you mentioned it
23  earlier in your deposition -- there was a,

Page 110

1  you went to plant --
2    A.  Three.
3    Q.  -- Plant 3; is that right?
4    A.  Yes.
5    Q.  Well, let me ask you this
6  first.  And I apologize for not asking it
7  earlier, Mr. Alexander, because you had
8  mentioned it in your deposition.
9       You had surgery on your right
10  knee?
11    A.  I had surgery twice on my
12  right knee, and one time on my left.
13    Q.  But one time was in 2000?
14    A.  During my time I was working
15  at Boral.
16    Q.  And was that -- on which
17  knee did you have the surgery?
18    A.  Right knee.
19    Q.  And that was in 2000?
20    A.  2000, yes.
21    Q.  And did you miss a period of
22  time from work?
23    A.  Probably about eight months.

Page 111

1    Q.  I was going to say.  That's
2  when you said you were on short-term
3  disability, right?
4    A.  Yes.
5    Q.  And then came back.  What
6  job were you in when you went out on
7  short-term disability?
8    A.  Oh, man.  I think I was
9  stacking at that time.
10    Q.  And then did you come back
11  to the same job?
12    A.  Yes.
13    Q.  Okay.  And then continued to
14  do that job until you got the other jobs
15  that you've testified to?
16    A.  Yes.
17    Q.  Okay.  And the surgeries on
18  your left my knee I think you said or the
19  problems were when you were in the Army,
20  military?
21    A.  Both -- both -- all of my
22  surgeries with my knees were done for
23  military reasons.  It wasn't done for

Page 112

1  Boral reasons.
2    Q.  Right.  But you just had the
3  one surgery?
4    A.  But I had one surgery while
5  I was working at Boral.
6    Q.  That's what I was getting
7  at.
8    A.  Yes.
9    Q.  And that was in 2000?
10    A.  Yes.
11    Q.  Now, I'm going to get back
12  to Plant 3.
13    A.  Okay.
14    Q.  Sorry about that.  You, at
15  some point as you earlier testified to in
16  your deposition I think it was in November
17  of 2004, I think you said November 22,
18  2004 --
19    A.  November 22nd.  The 22nd or
20  the 23rd.
21    Q.  -- that you then were then
22  transferred to Plant --
23    A.  Three.

ALEXANDER v BORAL     CondenseIt!™     DEPO:QUINCY ALEXANDER

Page 113

1    Q.   -- 3. And what were the
2 circumstances of that?
3    A.   We had -- we had a plant
4 shutdown. They said they was laying off
5 so many employees. So many employees was
6 probably going to get laid off. So many
7 employees are going to get bumped off of
8 their jobs for employees with seniority.
9     At that time, I -- I had less
10 seniority than Clyde. And he -- he bumped
11 me off of that job. So -- and that's when
12 they said I would have to go to Plant 3.
13     Now, that being said, when
14 they told me I was going to Plant 3, David
15 said there was like a couple of jobs left,
16 but those were stacker jobs, which people
17 with seniority already had taken.
18     He said there was also two
19 temporary jobs left which was at Plant 3
20 in their shape department. But he said,
21 you know, with me doing that job it will
22 be three dollars less in pay.
23    Q.   And when you say David,

Page 114

1 you're referring to Mr. Hay?
2    A.   David Hay.
3    Q.   Okay. So let me back up.
4 This was a plant shutdown. So that would
5 be Plant 1?
6    A.   Yes.
7    Q.   Okay. And as a result of
8 that, there were employees who were being
9 laid off?
10    A.   Yes.
11    Q.   And were they being laid off
12 by seniority?
13    A.   Yes. They were being bumped
14 off their job by seniority. Because other
15 positions -- like most of the guys from
16 the scrap department, they -- a lot of
17 guys in the shapes department were less
18 seniority than the guys in the scraping
19 department. And they came and bumped them
20 off their jobs.
21    Q.   Okay.
22    A.   And I guess that happened
23 throughout the plant. But at that time,

Page 115

1 you know, I came to David and asked him
2 about, you know, about Angie Curley.
3     Because at that time when I
4 went down to Plant 3, Angie Curley stayed
5 at the plant I was senior over her.
6     And David told me she was
7 doing some type of administrative work for
8 Scott. And my question was, if she was
9 doing administrative work for Scott and
10 the plant was shutting down, what kind of
11 administrative work would she be doing
12 instead -- it seemed like if the shapes
13 department is going to be the only
14 department open up there, what kind of
15 administrative work she was going to be
16 doing that I couldn't do.
17    Q.   Were you aware of what Angie
18 Curley was doing in her job?
19    A.   No. Was I -- what? What?
20 Say that again.
21    Q.   Were you aware of what Angie
22 Curley was doing in her jobs?
23    A.   No.

Page 116

1    Q.   Okay. But in any event, you
2 said that you had less seniority than
3 Clyde?
4    A.   Yes. Clyde was there a
5 year.
6    Q.   And Clyde Davis being your
7 cousin, right?
8    A.   Yes.
9    Q.   So he stayed at Plant 1?
10    A.   He bumped me from my job.
11    Q.   He stayed at Plant 1?
12    A.   Yes.
13    Q.   But you had enough seniority
14 to stay in the plant, but the jobs that
15 Mr. Hay told you about were plant stacker
16 jobs in shapes at Plant 3?
17    A.   No.
18    Q.   Okay.
19    A.   What -- my being -- okay.
20 Everything was explained to us about
21 seniority.
22     See, whoever was senior,
23 those were the jobs -- those are the

ALEXANDER v BORAL          CondenseIt!™          DEPO:QUINCY ALEXANDER

Page 117

1  people that were going to get the jobs.
2          Being that guys in the
3  scraping department were senior towards
4  some of our guys that were in the shapes
5  department, they bumped those guys off
6  their jobs. Some of them just lost their
7  jobs, got laid off because of that.
8          Now, if we were going --
9  that's what I said, if we was going by the
10  seniority at this point, you know, and
11  them guys that was coming from scraping
12  department didn't know anything about the
13  jobs in the shapes department, but they
14  still bumped them because of seniority,
15  that's when I questioned why was Angie
16  staying in the department. Why was Angie
17  staying at the plant and not me if I was
18  senior to her.
19          That's when David told me
20  Angie was doing administrative work for
21  Scott.
22      Q.  Okay. I understand that.
23      A.  Now, at the same time at the

Page 118

1  time, Robert Thompson, he stayed at the --
2  at the -- at the plant too doing arches.
3  He was cutting arches.
4          Now, again, I was -- I was
5  senior. I was probably a couple of months
6  or so before Robby. And I was saying, you
7  know, he's still at the plant also. And
8  these are two people which were, you know,
9  whites.
10      Q.  Uh-huh.
11      A.  I was like okay. I'm senior
12  to both of those people. Why didn't I
13  stay at the plant, or why didn't I get
14  offered either one of those jobs at the
15  time.
16      Q.  But --
17      A.  Now, I was told that Robby
18  was going to the sample -- same
19  department, you know. But at the same
20  time, I was like, well, why didn't I get
21  to go to the sample or why didn't I get
22  offered to go to the sampling department.
23          But at the same time, Robert

Page 119

1  continued to cut arches. I guess he was
2  placed in the sampling department, but at
3  the same time he was still working in the
4  same place he was working.
5      Q.  Okay.
6      A.  That's when I went down to
7  Plant 3 and lost my pay.
8      Q.  Okay. But let me get back
9  to what I was saying earlier or asking
10  earlier, that you were told that there
11  were jobs at Plant 3, stacking jobs at
12  Plant 3.
13      A.  There were temporary jobs at
14  Plant 3 in Plant 3 shaping department.
15  There were two temporary jobs at Plant 3
16  shaping department. And which any
17  position that I could take at the time I
18  had to take it.
19      Q.  Right. And that's how you
20  got to Plant 3?
21      A.  Yes.
22      Q.  Okay.
23      A.  Either that or be laid off.

Page 120

1  But that's when the question -- I started
2  questioning why were they still there and
3  I was senior to them.
4      Q.  But you don't know -- but,
5  again, you don't know what jobs Angie
6  Curley was doing?
7      A.  David told me she was doing
8  administrative work for Scott.
9      Q.  Yeah. But specifically you
10  don't know which jobs she was doing?
11      A.  No.
12      Q.  And you're saying that
13  Robert Thompson, Robby -- is that who you
14  said?
15      A.  Well, we call him Robby.
16  Robert Thompson.
17      Q.  That he was to go to samples
18  you said?
19      A.  Sampling department. They
20  were putting him on -- he was getting on
21  the sampling department's payroll.
22      Q.  Okay.
23      A.  But that wasn't a position

Page 121

1  that was offered to me either.
2      Q.  Okay.  And had he worked in
3  the sample department before to your
4  knowledge?
5      A.  I don't know.  Yes.  Yes.
6  He was at the sampling department before
7  he came to the shaping department, our
8  shape department.
9      Q.  Okay.  And do you know what
10  his pay rate was?
11      A.  I don't know.
12      Q.  Okay.  Did you know Robert
13  or Robby Thompson's?
14      A.  Did I know him?
15      Q.  Yes.  Was he working in
16  shapes too?
17      A.  Yes.  He was the shapes
18  department.
19      Q.  Did you ever have any
20  problem or difficulties with him?
21      A.  Tardiness.  He was late all
22  the time.
23      Q.  Okay.  Other than that, I

Page 122

1  mean, any trouble getting along with him?
2      A.  No.
3      Q.  I just kind of sense
4  generally that you really didn't have any
5  problems or difficulties with anybody at
6  Boral?
7      A.  No.  Like I said, the only
8  thing I had with Scott was that -- that --
9  that it was his way or the highway.
10      Q.  His way or the highway?
11      A.  Yes.
12      Q.  Okay.
13      A.  It was just, you know.
14      Q.  So you went to Plant 3?
15      A.  Yes.
16      Q.  And this is in November of
17  2004?
18      A.  Yes.
19      Q.  Okay.  And then how long
20  were you at Plant 3?
21      A.  Probably November, December
22  January.  Probably until January.
23  Probably until January or February.

Page 123

1      Because what happened was
2  I -- I -- I started back having knee
3  problems.  And I had to go on short-term
4  for about a couple of weeks or so.  Two or
5  three weeks.
6      And that's when I came back
7  to -- when I came back, I didn't come back
8  to Plant 3.  I came back to Plant 1 shapes
9  department.  So I was down there from
10  November to probably late February.
11      Q.  Okay.  And during some of
12  that period of time, you were off work?
13      A.  Probably two, three weeks
14  maybe.
15      Q.  Okay.  And when you came
16  back, which would have been like you said
17  in February or so --
18      A.  February or March.
19      Q.  -- or March --
20      A.  February.  Late February I
21  came back.  I didn't go back to Plant 3.
22  I came straight to Plant 1.
23      Q.  So when you came back in

Page 124

1  February or March, that would be 2005?
2      A.  Yes.
3      Q.  You came back to Plant 1 in
4  shapes?
5      A.  Yes.
6      Q.  Who told you you were coming
7  back to Plant 1 in shapes?
8      A.  Scott.
9      Q.  Okay.  And what did Scott
10  tell you?  And Scott being Scott Thompson.
11      A.  Okay.  He said that -- well,
12  he said that it benefitted you for -- with
13  your knee condition, it benefitted you
14  because, you know, you can come back to
15  the shapes department.  You don't have to
16  go back down there.
17      And also, he said -- well, I
18  asked the question, I asked will I be
19  getting my pay back.  He said, well, it
20  could be a couple of weeks or so or even
21  be a month or so, but we'll try to get you
22  back at your pay.
23      Q.  Okay.  And when you came

ALEXANDER v BORAL                CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 125

1 back to shapes, were you working in
2 inventory?
3      A.   When I came back to shapes,
4 I started doing back the same thing I was
5 doing before I left.
6      Q.   Which was what?
7      A.   Everything to do at the
8 department. Pretty much like running the
9 department again.
10          But like I said, at this time
11 when I came back, I was Clyde's assistant
12 as if -- like he was mine before I left.
13     Q.   And what shift were you on?
14     A.   First shift. It was first
15 shift.
16     Q.   Who else was in shapes with
17 you when you came back in March of 2005?
18     A.   Just regular employees.
19     Q.   Was Angie Curley there?
20     A.   No.
21     Q.   When you came back in shapes
22 in March of 2005, did you work inventory?
23     A.   Yes, I did inventory. I

Page 126

1 did -- I started doing shipping. I
2 started -- I was writing tickets.
3          Like I said, pretty much the
4 same stuff I was doing before I left.
5          They had -- when I came back,
6 every year -- every year Boral have an
7 inventory coming up.
8      Q.   Uh-huh.
9      A.   An inventory. And that's
10 when, you know, Clyde -- I didn't train
11 Clyde on the inventory.
12         So when I came back, of
13 course, I had to do the inventory.
14     Q.   So at the time you came back
15 was about the time that they annually did
16 the inventory?
17     A.   Inventory was coming up.
18     Q.   It was coming up?
19     A.   It was coming up like May,
20 June.
21     Q.   Did Scott tell you they
22 needed you back in shapes to help with the
23 inventory in March of 2005?

Page 127

1      A.   No. He didn't exactly tell
2 me why I was coming back. Like I said,
3 you know, the time was right for me to
4 come back to the shapes department.
5      Q.   Who was the supervisor over
6 shapes at that point?
7      A.   Clyde. Clyde Davis.
8      Q.   Okay. And during the time
9 that you were at Boral, on one occasion or
10 at least two occasions, you bid two jobs
11 and at one time you got the jobs in
12 shapes, correct?
13     A.   Yes.
14     Q.   Were there any other jobs
15 that you bid to that you didn't get at
16 Boral?
17     A.   No.
18     Q.   And you were aware of the
19 bid procedure and how it worked?
20     A.   Yes. I don't -- I never
21 applied for another job.
22     Q.   The bids would go up on a
23 board, and you had a certain amount of

Page 128

1 time to apply for the position, and it
2 would be awarded?
3      A.   That's supposedly the way
4 it's supposed to work.
5      Q.   Okay. And you understood
6 that was how it was supposed to work?
7      A.   Yes.
8      Q.   But you weren't interested
9 in and didn't bid on any other jobs?
10     A.   The other jobs that came up
11 I didn't want them. I mean, I wasn't
12 interested.
13     Q.   Okay. When you were -- when
14 you came back into shapes in March of
15 2005, were you -- did you do cycle
16 counts and adjustments in the inventory?
17     A.   When I came back in March?
18     Q.   Yes.
19     A.   Yes. Yes. Yes. We did
20 cycle counts. Clyde did most most of
21 that. Clyde did most of that.
22         What would happen -- what
23 would happen, Seldrick Tarver is a guy

Page 129

1 that actually -- he -- he -- he does --
2 like when customers come in, truck drivers
3 come in, he loads them up.
4       At the end of the day when
5 the guys have stacked the bricks up and
6 they strap them down and roll them out,
7 Seldrick would actually -- since he be on
8 the forklift, he would get the brick and
9 sometimes count them and put them in
10 inventory.
11    Q.   Okay.
12    A.   Sometimes.  Sometimes Clyde
13 would do it.  Sometimes I would do it.  If
14 Seldrick take vacations or Seldrick get
15 off early or anything, Clyde and I would
16 do it sometimes also.
17       But that's -- that's pretty
18 much the way it worked.  You go out there
19 and count the packs or you count the scrap
20 bricks, you know, the loose bricks.  And,
21 you know, you write them down, and you go
22 ahead and put them in the system.
23    Q.   When does that annual

Page 130

1 inventory take place?
2    A.   That's probably every --
3    Q.   Is that in the spring?
4    A.   Probably end of spring.
5    Q.   And you were involved in
6 2005 when you came back in the annual
7 inventory?
8    A.   Yes.  Yes.
9    Q.   Okay.  And then did you also
10 from time to time enter data on the
11 company's computers as a result -- for
12 inventory --
13    A.   Yes.
14    Q.   -- and shipping purposes?
15    A.   From time to time, yes.
16    Q.   And do shipping tickets for
17 truck drivers and that sort of thing?
18    A.   Yes.
19    Q.   Okay.
20       (Whereupon, Defendants' Exhibit No.
21 4 was marked for identification purposes
22 by Mr. Rowe.)
23    Q.   (BY MR. ROWE)  Let me show

Page 131

1 you Defendants' Exhibit 4, which is a copy
2 of a book entitled Employee Guidelines,
3 Boral Bricks, Inc., revised January of
4 2002.
5       And it consists of several
6 pages, but it's a copy of a booklet that's
7 numbered through page 31.  And this was
8 produced by the defendants in this
9 litigation.
10       Did you receive a copy of
11 this Employee Guidelines?
12    A.   Yes.
13    Q.   Okay.  And did you read it
14 when you received it?
15    A.   Not all of it.  A couple of
16 pages here and there.
17    Q.   Do you still have a copy of
18 it?
19    A.   You -- you all sent it to me
20 like --
21    Q.   Other than the one we sent
22 to you?
23    A.   Oh, no.  No.  No.  No.  I

Page 132

1 have the one you sent me.  But other than
2 that, I never seen one of these in years.
3       (Whereupon, Defendants' Exhibit No.
4 5 was marked for identification purposes
5 by Mr. Rowe.)
6    Q.   (BY MR. ROWE)  I'm going to
7 show you now what's been marked as Exhibit
8 5, Deposition Exhibit 5, which is a
9 document entitled Employee Acknowledgment
10 of Receipt of Employee Guidebook.
11    A.   Okay.
12    Q.   And is that your signature
13 that appears at the bottom --
14    A.   Yes.
15    Q.   -- dated February 21, 2002?
16    A.   Yes.
17    Q.   Okay.  And in the employee
18 guidelines, you understood that promotions
19 and transfers are covered it it.  Look on
20 page 13 of Exhibit 4.
21    A.   (Witness complying.)  Okay.
22    Q.   And you understood that
23 pursuant to that open positions would be

**ALEXANDER v BORAL**          CondenseIt!™          **DEPO:QUINCY ALEXANDER**

Page 133

1 posted and employees --
2    A.    Yes.
3    Q.    -- could bid on them and
4 that the company would select what it
5 considered to be the most competent person
6 for the position?
7    A.    Exactly.
8    Q.    And then, also, you knew
9 that the employee guidelines also have a
10 complaint procedure, which I think is
11 started at page three and runs into page
12 four. If you had a complaint, that you
13 could raise the complaint. Do you see
14 that on Exhibit 4?
15    A.    What? The general thing?
16    Q.    Page 3 and 4.
17    A.    If you have a problem?
18    Q.    Yeah. An open-door policy?
19    A.    Yes.
20    Q.    You understood that?
21    A.    Yes.
22    Q.    Okay. And at no time during
23 your employment at Boral did you ever

Page 134

1 raise a formal complaint under that
2 procedure; is that correct?
3    A.    No. No. Yes, that's
4 correct. If we had problem, pretty much
5 like they would bring -- they would have a
6 thing where they bring I think -- what's
7 his name -- Leonard Gibbs or some other
8 guys would come down and talk to the
9 employees about if you have any problems.
10       It's just a group thing where
11 they bring employees down and say if you
12 have certain problems that they will
13 probably have throughout the company. And
14 that's -- that's --
15    Q.    But you didn't raise any
16 complaints through that procedure or --
17    A.    Through this procedure, no.
18    Q.    -- otherwise?
19    A.    No.
20    Q.    Or to Mr. Gibbs for that
21 matter?
22    A.    No.
23    Q.    Let's turn to 2006. At that

Page 135

1 point in time, early 2006, you're back in
2 shapes as you've testified. Came back in
3 March of 2005.
4       Did you learn that the
5 company was going to be cutting back and
6 to have a reduction in force --
7    A.    Yes.
8    Q.    -- like it had had about a
9 year before then?
10    A.    Yes.
11    Q.    And how did you learn that?
12    A.    Scott Thompson called
13 several guys in a meeting. Called --
14 well, he called like five, six of us or
15 something. Called us up to the front
16 office and told us that there was going to
17 be another layoff because the product
18 wasn't selling.
19       And at that time, he said
20 that there was one position -- he said
21 there was one position open. And the
22 person with seniority got the first choice
23 to get that position, which was the

Page 136

1 position was at Plant 3. I forgot the
2 type of position it was.
3       But Kenneth Davis, who was
4 senior over all of us at that time, he --
5 he got that position. Because like I say,
6 he had the first choice. And he took it.
7       Now, at that time, Scott told
8 us that the rest of us would be laid off.
9 And that people who had a vacation you
10 could take it through your vacation.
11       At the time, I had a three-
12 week vacation. He said after that your
13 unemployment will start.
14       Now, he said he don't know
15 how long it will last or whatever. But he
16 said he will probably be contacting us
17 soon, or sooner than we probably think, or
18 it might be a little longer than we think.
19 So that's when I was laid off.
20    Q.    Okay.
21    A.    Afterwards -- afterwards I
22 was told that Angie was working in that
23 position. That position that I left she

Page 137

1  was working in it.
2        And that's when I raised the
3  question, about, you know, how was she
4  working in a position that don't supposed
5  to be there no more.  Why should she be in
6  that position if I'm still senior to her?
7  And she was at another plant at the time.
8        And at the same time -- the
9  same time Robert -- Robert Thompson was
10  offered Angie's job.  He interviewed for
11  Angie's job.  He said it was Angie's job
12  what he was interviewed for.
13        So that raised the question
14  in my mind was like why did he interview
15  for her job before -- he was laid off
16  before I was laid off.
17        I was never told about that
18  position was going to be open.  And why
19  would he interview for that job before I
20  would?  I was was senior to him also.
21    Q.  Let's go back.
22    A.  Okay.
23    Q.  You said that Scott Thompson

Page 138

1  called several people into a meeting?
2    A.  Uh-huh.  Yes.
3    Q.  Okay.  When was that?
4    A.  Oh, my God.  That was -- it
5  was in February.  It was -- it was -- it
6  was either late January or February.
7    Q.  Okay.
8    A.  Of 2006.
9    Q.  Okay.  And you said that he
10  told you that another layoff -- there was
11  going to be another layoff again?
12    A.  Yes.
13    Q.  At Plant 1?
14    A.  (Nodding head.)
15    Q.  And did he tell you that the
16  shapes production was down?
17    A.  He said the product wasn't
18  selling.
19    Q.  Okay.  And who else was in
20  that meeting with you?  You said there
21  were several people.
22    A.  Kenneth Davis, Robby
23  Thompson.  I was.  Clyde Davis, Scott.

Page 139

1  Who else was at that meeting?
2    Q.  Anybody else?
3    A.  I -- who else was in that
4  meeting?  Clyde Scott, Robby, Kenneth.
5  I'm -- I'm not sure who else got laid off.
6  I know Robby and I were the ones that got
7  laid off.
8    Q.  Okay.  And you said that
9  Scott indicated that there was another
10  position that would be open?
11    A.  There was one more position
12  open at Plant 3.
13    Q.  At Plant 3?
14    A.  That would be filled --
15    Q.  And that that would be
16  filled by seniority?
17    A.  Yes.  And Kenneth Davis had
18  seniority.
19    Q.  And Ken Davis -- and he did
20  have seniority over you?
21    A.  Yes.
22    Q.  And then you said something
23  about that you could take vacation?

Page 140

1    A.  We had -- I had three weeks
2  vacation at the time.  And Scott said,
3  well, we can take those three weeks
4  vacation.  And then we'll go to
5  unemployment office and put in for the
6  unemployment.
7    Q.  So you would be laid off --
8    A.  After the three-week
9  vacation.
10    Q.  -- effective at the end of
11  that three-week vacation?
12    A.  Yes.  Yes.
13    Q.  Okay.  And I think it looked
14  like that the last day that you worked
15  there would have been February 6th, 2006?
16  Does that sound about right?
17    A.  Probably.  Probably.
18    Q.  And then --
19    A.  It was somewhere in that
20  area.
21    Q.  And then with three weeks
22  vacation that you were --
23    A.  The 24th I think it was.

ALEXANDER v BORAL                CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 141

1    Q.  -- laid off effective the
2  end of February, the 24th or 25th --
3    A.  Yes.
4    Q.  -- somewhere in there of
5  February, 2006?
6    A.  Yes.
7    Q.  Was Robby Thompson, or
8  Robert Thompson, in the same situation
9  that he took vacation too?
10   A.  Yes.
11   Q.  And then he got laid off?
12   A.  Yes.
13   Q.  And --
14   A.  But he said --
15   Q.  Now, I'm going to get to
16 that.
17   A.  Okay.
18   Q.  Okay.  I'm going to ask you
19 about that.
20   A.  Okay.
21   Q.  Because I want to know the
22 timing of some of this.
23   A.  Okay.

Page 142

1    Q.  Now, you mentioned that you
2  later learned that Angie Curley -- is that
3  who we're talking about when you say
4  Angie?  Angie Curley --
5    A.  Yes.
6    Q.  -- was in a position in
7  shapes?
8    A.  No.  She was at Plant 3.
9    Q.  Okay.
10   A.  I think she was working in
11 maintenance at Plant 3 or something.
12   Q.  Okay.  All right.
13   A.  I don't know exactly what
14 was her job.  But she was at Plant 3.  I
15 know that much.
16   Q.  And that --
17   A.  Therefore -- and at that
18 time, Scott was at Plant 3 also.  The only
19 people up physically at Plant 1 were the
20 people in the shapes department.
21   Q.  But Scott had responsibility
22 for Plant 1?
23   A.  Assistant plant manager.

Page 143

1    Q.  Right.
2    A.  I guess Scott and Steve
3  still were the managers of Plant 1.
4    Q.  When you say Steve --
5    A.  Steve Markovich.  He was the
6  plant manager.  And Scott --
7    Q.  Markovich.  He was the plant
8  manager and --
9    A.  And Scott was assistant
10 plant manager.
11   Q.  Okay.  Well, let me ask this
12 question then.  Do you know who made the
13 decision that you or Robby Thompson would
14 be laid off?
15   A.  Scott is the one who talked
16 to us whole the time.  Steve Markovich
17 never talked to us about any layoff or
18 anything.
19   Q.  But you don't know who made
20 the decision that you would be laid off?
21   A.  Scott told us we were going
22 to be laid off.
23   Q.  I know Scott told you that.

Page 144

1  But did Scott tell you he made the
2  decision that you were going to be laid
3  off?
4    A.  He never said who made the
5  decision.  But he's the one that talked to
6  us the whole time.
7    Q.  But just based on the fact
8  that he had talked to you --
9    A.  He talked to us.
10   Q.  -- then you assumed he made
11 the decision, but you don't know?
12   A.  I don't know.  That's who
13 told us.
14   Q.  Your answer is better than
15 my question.  So you don't know who made
16 the decision, but Scott told you about the
17 decision?
18   A.  Scott told us.
19   Q.  Okay.  With respect to Angie
20 now, Angie Curley, you said she was at
21 Plant 3?
22   A.  Yes.
23   Q.  And do you know what

FREEDOM COURT REPORTING    (334) 300-3832                Page 141 - Page 144

Page 145

1 position she was in?
2     A.  I think she was -- she was
3 working in maintenance.  I don't know.  I
4 don't know her position at Plant 3.
5     Q.  Okay.  And I think I asked
6 you earlier, but you really don't know
7 what other jobs she had held at Boral; is
8 that correct?
9     A.  As far as I know.  I don't
10 know what Angie did at Boral Bricks.
11     Q.  Okay.  And then at some
12 point in time you said, if I wrote it down
13 right, that you had a question as to how
14 Angie was in the position.
15         And I don't know if you were
16 referring to Plant 1 or Plant 3 when you
17 said that.
18     A.  When I said what?
19     Q.  Okay.  You said that you
20 didn't know how Angie ended up in the
21 position.
22     A.  In the position that I was
23 in at Plant 1.

Page 146

1     Q.  Okay.  That's what I'm
2 getting at.  So at some point in time, you
3 learned that Angie was in the position
4 that you had at Plant 1?
5     A.  Yes.
6     Q.  And was this --
7     A.  After I was laid off.
8     Q.  That's what I'm saying.
9 This would have been sometime after the
10 end of February, sometime later after you
11 got laid off?
12     A.  Yes.
13     Q.  And how did you learn that?
14     A.  Sources.  People told me.
15     Q.  Well, I need to know who.
16     A.  People told me.  I mean,
17 Larry -- Larry Joseph told me.
18     Q.  Anybody else?
19     A.  Oh, my God.  Who else?  I
20 mean, everybody in the shapes department
21 at that time.
22     Q.  Okay.  And was Clyde still
23 in the shapes department?

Page 147

1     A.  Clyde -- Clyde had got an
2 arbitrator -- some kind of arbitrator job
3 at that time.  Because when we went to
4 that meeting with Scott, and he told us
5 about the layoff --
6     Q.  Yes.
7     A.  -- Clyde had already bidded
8 for some type of arbitrator's job that he
9 was about to get.  So he was leaving
10 anyway.
11     Q.  Into another position at
12 Boral?
13     A.  In another position at
14 Boral.
15     Q.  And then you said at some
16 point in time after you were laid off, you
17 learned from Larry Joseph or others in
18 shapes --
19     A.  Other employees.  About --
20 it was several employees from in the
21 shapes department.
22     Q.  But that Angie was in Plant
23 1 shapes?

Page 148

1     A.  Yes.  Was doing --
2     Q.  Was she a lead there?
3     A.  I would imagine so.
4     Q.  Do you know exactly what she
5 was doing?
6     A.  She was doing the same thing
7 that I was doing.  She was writing the
8 tickets, telling them what to do.
9     Q.  Well, the only knowledge you
10 have about what she was doing is what
11 somebody else told you she was doing?
12     A.  Exactly.
13     Q.  You don't have any personal
14 knowledge of what her job --
15     A.  No.
16     Q.  -- duties were?
17     A.  No.  No.
18     Q.  Or what else she may have
19 been doing besides working at Plant 1?
20     A.  Exactly.
21     Q.  Okay.  And then you said
22 something about Robby or Robert Thompson,
23 you said that he had interviewed for

Page 157

1 talked to at Boral, either a current or
2 former employee, about your case or your
3 claims?
4    A.   No.
5    Q.   So it's just Robert
6 Thompson, Jerry Jones and Larry Joseph?
7    A.   Yes.
8    Q.   And that's it?
9    A.   Yes.
10    Q.   Nobody else?
11    A.   No.
12    Q.   During the time that you
13 were on vacation, did you continue --
14 continue to be paid?
15        And when I say on vacation, I
16 mean in February of 2006.  After you were
17 told you were being laid off but you could
18 take vacation until in essence the
19 effective date and then you could file for
20 unemployment, did you pick up paychecks or
21 get paychecks during your time you were on
22 that three weeks of vacation?
23    A.   No.  I didn't pick up no

Page 158

1 paycheck.  I had direct deposit.  So they
2 were sent to me.  Well, they were
3 deposited in my account.
4    Q.   Do you have your bank
5 records?  Have you maintained your bank
6 records that would reflect the direct
7 deposit?
8    A.   I'm not with CB&T -- not
9 CB&T.  I'm not with TIC no more.  They
10 were with TIC.  But I don't have the bank
11 records from TIC because I'm with CB&T
12 now.
13    Q.   And I have no idea what TIC
14 and CB&T means.
15    A.   TIC is a credit union
16 Federal credit union.  And CB&T is
17 Columbus Bank and Trust.
18    Q.   Okay.  During the time that
19 you were off on vacation, were you aware
20 that there were open positions at Boral
21 for which you could have submitted bids?
22    A.   No.
23    Q.   Did you ever come to the

Page 159

1 plant to check to see if there were open
2 positions for which you could submit bids?
3    A.   No.  No.  But I'm glad you
4 asked that.  Because when I did --
5    Q.   I am too.
6    A.   Yeah.  Because when I did
7 see Robby, he did say that he was called
8 for a job.
9    Q.   I'm going to come back to
10 that.
11    A.   Okay.
12    Q.   And I appreciate your
13 telling me that too.
14    A.   Okay.
15    Q.   But you never came to the
16 plant during the time you were on vacation
17 to check for job postings?
18    A.   No.
19    Q.   Did you ever receive
20 anything from the company, from David Hay
21 or anybody at the company; that is, at
22 Boral, about open positions for which you
23 could have submitted bids during the time

Page 160

1 you were on that vacation period?
2    A.   No.
3    Q.   Okay.  And you're telling me
4 that during this time you had direct
5 deposit?
6    A.   Yes.  I had direct deposit.
7    Q.   And never did pick up a
8 paycheck or anything else from the plant?
9    A.   No.  I had direct deposit.
10 I know what forty hours -- knew what forty
11 hours was going to pay.
12    Q.   All right.
13    A.   So there's no sense in
14 picking up the check stub.
15    Q.   During the time that you
16 were on vacation in February of 2006, did
17 you come to the plant at all?
18    A.   I probably came to -- I
19 probably come down there once or twice.
20    Q.   And when you came to the
21 plant, did you check the boards to see
22 about job --
23    A.   No.

**ALEXANDER v BORAL**  CondenseIt!™  **DEPO:QUINCY ALEXANDER**

Page 161

1  Q.  -- postings?
2  A.  No.
3  Q.  Why not?
4  A.  I mean, what boards?  If a
5  job was posted, some time it would be
6  posted in the break room.  But at the same
7  time, I had no -- I didn't go in the break
8  room.
9  Q.  Okay.  And as I understand
10  it, at no time that you were on vacation
11  did you make inquiry to anybody at Boral
12  whether there were any open positions?
13  A.  No.
14  Q.  Or posted jobs?
15  A.  No.
16  Q.  Okay.  How often would you
17  get paid at Boral?
18  A.  Weekly.
19  Q.  Okay.  And what was the
20  payday?
21  A.  What was the pay?
22  Q.  What was the payday?  I'm
23  sorry.

Page 162

1  A.  Oh, Thursday.  I think
2  Thursdays.
3  Q.  Okay.
4  Q.  After you left Boral --
5  strike that.  Let me start that question
6  over again.
7      When you were on vacation in
8  February, 2006, did you have any contact
9  with anybody from Boral other than going
10  to the plant on the occasions you said you
11  did?
12  A.  When I -- when I was on --
13  Q.  While you were on vacation.
14  A.  I see employees that work at
15  Boral.  I speak to them or something like
16  that.  Like I said, social conversations.
17      I mean, I run into them.  If
18  they're from Phenix City, nine times out
19  of ten you're going to see them somewhere.
20  Q.  Did any of those employees
21  tell you about open positions?
22  A.  Oh, no.  No.  I mean, it's
23  like when you talk to people, I mean --

Page 163

1  the first thing, social conversations
2  don't really be about positions coming
3  open.  I mean --
4  Q.  No.  I understand what
5  you're saying.  I'm just asking if they
6  raised that with you.
7  A.  No.  No.
8  Q.  And you didn't ask?
9  A.  No.
10  Q.  Okay.  Now, during this
11  period of time in 2006, did you have a
12  home telephone --
13  A.  Yes.
14  Q.  -- at your place of
15  residence?
16  A.  Yes.
17  Q.  And I mean other -- what do
18  we call it?  A land line now I guess is
19  what you'd call it.
20  A.  Yes.
21  Q.  Did you also have a cell
22  phone?
23  A.  Yes.  I got a cell phone.

Page 164

1  Q.  And did the company have
2  knowledge of your phone numbers to the
3  best of your knowledge?
4  A.  Not my cell phone.
5  Q.  But they had knowledge of
6  your home phone number?
7  A.  They had knowledge of my
8  home phone.
9  Q.  And did you have an
10  answering machine on your home phone?
11  A.  No.  I got an answering
12  machine on it, but I got a fax.  The fax
13  will pick up.
14      If it rings like three or
15  four times, the fax will pick up.  I never
16  get a message.  But I don't have no
17  physical answering machine, no.
18  Q.  You do or you do not have an
19  answering machine?
20  A.  No.  I don't have an
21  answering machine.
22  Q.  So if somebody would have
23  called and said they left you a message,

ALEXANDER v BORAL                 CondenseIt!™                 DEPO:QUINCY ALEXANDER

Page 169

1    Q.   But then you didn't call
2  anybody at Boral to ask --
3    A.   No.
4    Q.   -- about that?
5    A.   No.
6    Q.   Okay.  Since your layoff in
7  February, 2006, had you seen or talked to
8  Mr. Hay before today --
9    A.   No.
10    Q.   -- seeing him here at the
11  deposition?
12    A.   No.
13    Q.   During the time that you
14  worked at Boral, Mr. Alexander, did you
15  ever have -- you never did payroll or
16  weren't ever involved in payroll, were
17  you?
18    A.   I did time sheets.
19    Q.   But you never calculated
20  payroll; is that correct?  Or were
21  involved in payroll?
22    A.   Meaning?  I mean, I don't
23  understand your question.  I mean, like I

Page 170

1  said --
2    Q.   Figuring out --
3    A.   I did the people's time and
4  knew how many hours they got for the week
5  and that kind of thing.
6    Q.   So somebody would have a
7  time sheet, and you would look at the time
8  sheet and turn that in?
9    A.   I would get the time sheet
10  and write everybody's hours on the time
11  sheet.
12    Q.   Okay.  And then that would
13  go in, and then somebody would figure out
14  the payroll from that?
15    A.   Exactly.
16    Q.   But that figuring out the
17  payroll from that you never did?
18    A.   No.
19    Q.   And you never received any
20  behavioral safety training, or BST?
21    A.   Behavioral safety?
22    Q.   Yeah.  Do you know what I'm
23  talking about?

Page 171

1    A.   No.
2    Q.   And you were never an MRO in
3  maintenance?
4    A.   What's that?
5    Q.   Okay.  And you never worked
6  with environmental issues at the plant?
7    A.   We -- we put down solvent
8  for little fuel spills and stuff like
9  that.
10    Q.   Okay.  But insofar as any
11  paperwork or involvement or environmental
12  calculations or anything of that nature,
13  you weren't involved with that?
14    A.   No.
15    Q.   And you were never plant
16  safety officer at any time, were you?
17    A.   No.  I was asked to be, but
18  no.
19    Q.   Okay.  When you were laid
20  off, at the time you were laid off, did
21  you -- you said Mr. Thompson was laid off
22  at the same time; is that correct?
23    A.   Yes.

Page 172

1    Q.   Is there anybody that you
2  thought should have been laid off instead
3  of you or Mr. Thompson?
4    A.   As far as -- as far as the
5  seniority, no.  Not at that time.  Well,
6  like I said, when I heard about Angie
7  starting work in that position, then I'm
8  like I know I was senior to her, why in
9  the world would she still be there.
10    Q.   Okay.  And did you ever ask
11  anybody that question?
12    A.   After I got -- after the
13  layoff?
14    Q.   Yes.
15    A.   No.  No.
16    Q.   I'm not done but let's take
17  a break.
18        (Short break.)
19    Q.   (BY MR. ROWE)  Okay.  We're
20  back on the Record, and we had a little
21  break, Mr. Alexander.  I had a couple of
22  questions that I wanted to ask.
23        First, with respect to your

Page 181

1 Robert Thompson told you?
2    A. Yes.
3    Q. And then the bottom of that
4 page, we've covered that in your
5 deposition already I think.
6       And this is again reference
7 to page six about Angie working in your --
8 in that position and also Thompson telling
9 you that he had talked to David Hay.
10      We've already covered that in
11 your deposition, haven't we?
12    A. Yes.
13    Q. Okay. Looking at page three
14 of Exhibit 6, you state: There were times
15 on the job when I was in pain because of
16 my military injuries.
17      Now, is that the knee?
18    A. The knees and back.
19    Q. And the back?
20    A. Yes, sir.
21    Q. And you've already described
22 that in your deposition?
23    A. Yes.

Page 182

1    Q. And you said Scott stated if
2 I couldn't walk around then go home.
3    A. Yes.
4    Q. So when did that occur?
5    A. I mean, that -- that
6 occurred on probably several, several
7 times. I couldn't probably give an exact
8 dates.
9       Because it was times where,
10 you know, during inventory or -- whereas,
11 you, of course, if you're out there
12 counting bricks, of course, you have to
13 move bricks. And you probably have to
14 stack a few bricks, and that caused you to
15 bend over and this and that.
16    Q. Uh-huh.
17    A. And there, you know, were
18 times where like oh, my God, a little pain
19 here.
20      And Scott, you know, you get
21 to start telling him, Scott, you know,
22 this is going on, that's going on.
23      Well, if you can't -- well,

Page 183

1 if you can't do the job, you can go across
2 the railroad tracks, make statements like
3 that. And the railroad track runs along
4 Brickyard Road. You can't cross the
5 railroad track, but you can go home.
6    Q. So that's how you took it?
7    A. Yes.
8    Q. Well, you go on to state
9 that I never had a moment where I --
10 whereas I didn't or couldn't do my job.
11    A. Exactly.
12    Q. And that gets back to what I
13 think you earlier testified to that at no
14 time were you ever restricted from doing
15 your job?
16    A. No. No.
17    Q. That you could do and did do
18 the jobs that you had?
19    A. No. No. One time -- one
20 time at Boral what happened, I think I --
21 it was a finger, my finger. I hurt my
22 finger or something. The nail was pulled
23 off, and I had to get stitches right here.

Page 184

1       At that particular time, they
2 were sending employees to Goodwill to do
3 work as far as -- as far as -- what they
4 call it when you restricted duty --
5 restricted duty.
6       At that time, Boral sent you.
7 That's the time I got hurt at Boral.
8    Q. And that's your finger?
9    A. Yes.
10    Q. But with respect to the knee
11 or the back or anything like that, that
12 never kept you from doing your job?
13    A. No.
14    Q. And you could do your job?
15    A. Of course, you be in pain.
16 But you got kids to take care of. You got
17 to do your job.
18    Q. And you were never
19 restricted from doing your job?
20    A. No.
21    Q. All right. And you make a
22 statement here about maintenance people
23 who rode on golf carts in and around the

Page 185

1 plant. That's for the maintenance people
2 who were on golf carts as they would go
3 from one plant to another or within the
4 plant?
5    A.   Within the plant.
6    Q.   Okay.
7    A.   Scott had a golf cart also.
8 I mean --
9    Q.   Okay.
10    A.   I never have talked about
11 getting no golf cart from them. I'm just
12 saying --
13    Q.   I was going to say: You
14 never requested a golf cart or anything
15 like that?
16    A.   No. No. No. But at the
17 same time -- I didn't look for special
18 favors, but at the same time don't -- I
19 was looking at it from the perspective of
20 don't tell me if I can't do a job I can go
21 home. I can go across that railroad track
22 when --
23    Q.   He didn't say go home. He

Page 186

1 said you can go across the railroad track?
2    A.   He said home. He said you
3 can go home. Like I say, he said that
4 several times. You know, you can go home.
5 Brother, you can go home. If you can't do
6 the job, go home. Just hit the railroad
7 tracks.
8         But that was not a time where
9 I couldn't exactly do my job. But there
10 were times that I complained about my
11 pain, you know.
12    Q.   Okay.
13    A.   In that perspective. That's
14 why I was like, you know, here it is that
15 you've got guys running around here on
16 golf carts and, you know, you want to
17 threaten to send me home because I'm in
18 pain. And here it is I'm a disabled
19 veteran.
20    Q.   Well, at no time did you
21 ever seek any special treatment or
22 anything like that --
23    A.   No.

Page 187

1    Q.   -- or any accommodation or
2 anything like that?
3    A.   No. No.
4    Q.   Okay.
5    A.   Now, one time -- let me tell
6 you what they told me one time. When
7 Scott -- I wrote Steve an e-mail, Steve
8 Markovich.
9         I wrote him an e-mail about
10 my -- about my pay. Like I say, when I
11 first got back up there in 2005 and asked
12 Scott, I inquired about my pay as far --
13 like I said, the way I look at it, when
14 Clyde was my assistant, we were getting
15 paid the same thing.
16         I was back up there as
17 Clyde's assistant. I looked at it in the
18 same way as okay I am Clyde's assistant.
19 We should still be getting the same pay.
20         The only thing that changed
21 was the positions, but we were getting the
22 same pay. And I inquired about it with
23 Scott. And he said, okay. It could be a

Page 188

1 couple of weeks or it could be a month or
2 so, but we'll try to get you back there.
3         After that didn't happen, I
4 inquired to David Hay about it. And David
5 told me -- the first thing David said was,
6 well, I didn't even know you were back at
7 the plant. Tell Scott that he needs to
8 get back with me and, you know, physically
9 put you back up at the plant as far as
10 paperwork I guess.
11         And when I got back with
12 Scott, Scott told me that, you know, we're
13 looking at it. I'm looking at it. I'm
14 going to do it, this and that.
15         After it didn't happen,
16 that's when I went to Steve Markovich.
17 You know, going through the chains. I
18 went to Steve Markovich. And Steve
19 Markovich said I don't think that's a good
20 idea.
21         And I'm like what you mean
22 it's not a good idea. So, therefore, I
23 sent Steve an e-mail, and said okay, put

ALEXANDER v BORAL                    CondenseIt!™                    DEPO:QUINCY ALEXANDER

Page 189

1 it in writing to me why it's not a good
2 idea for me to receive my pay, you know,
3 if Clyde and I were doing the same job and
4 Clyde was getting one pay and I was
5 getting another pay.
6        And Steve Markovich said,
7 well -- at that time Clyde came to me
8 probably later on that evening and said
9 that, okay, Scott and Steve want to have a
10 meeting with us.
11       And that's when we went to
12 the meeting and had a meeting with Scott
13 and Steve. Steve didn't do no talking.
14 Scott did all the talking.
15       He said we brought you in the
16 office because we know you got bad knees.
17       You brought me in the office
18 because you knew I could do the job.
19 That's why you brought me in the office.
20 He didn't bring me in the office because I
21 had bad knees. Scott said we was looking
22 out for your best interests. You know you
23 got the bad knees.

Page 190

1        I was like, well, and the
2 pay. Well, we're making some changes and
3 don't think it's a good idea right now.
4        And the changes were that's
5 when I got laid off. I was like, you
6 know, you lay me off in the next couple of
7 days or so and Angie -- here it is that
8 Angie is in that position.
9        That's when I wanted
10 questions and answers like what is it, you
11 know, that was against me that I was
12 inquiring about the pay.
13       If anybody feel that they're
14 not getting the right pay, they inquire
15 about it. If they got any sense, you
16 inquire about it.
17  Q.  Uh-huh.
18  A.  But it seemed like when I
19 inquired about it, the next thing you
20 know, well, a layoff occurs.
21       I don't know if the product
22 was selling or not. But if you tell me
23 the product is not selling and you say

Page 191

1 we're having a layoff and you lay me off
2 and you say you're doing it by seniority
3 and I get laid off and the next day a
4 person with less seniority is in my
5 position, that's telling me that evidently
6 your product is selling just fine. You
7 just want to get rid of me.
8        At the same time, you put a
9 person with less seniority who just
10 happened to be a white person in my
11 position.
12  Q.  Uh-huh.
13  A.  You know, and that's why I
14 filed a complaint through the EEOC.
15  Q.  Okay. And Mr. Thompson was
16 laid off at the same time?
17  A.  Robby Thompson?
18  Q.  Yes.
19  A.  Yes, he was laid off.
20  Q.  And is he white or black?
21  A.  Robby Thompson is white.
22  Q.  And did he have more
23 seniority than you?

Page 192

1  A.  He had less seniority than
2 me. But at the same time --
3  Q.  But he had more seniority
4 than Angie Curley as you said?
5  A.  Yes. At the same time, he
6 was offered Angie's job before he was laid
7 off.
8  Q.  But he got laid off, and she
9 stayed; and he's white, and she's white?
10  A.  Yes.
11  (Whereupon, Defendants' Exhibit No.
12 7 was marked for identification purposes
13 by Mr. Rowe.)
14  Q.  (BY MR. ROWE) Let me show
15 you what's been marked as 7. This is
16 another filing consisting of three pages.
17       And is this something that
18 you filed with the court?
19  A.  Yes. The Court told me I
20 didn't file it right. So I just had to
21 send it back through. It's the same thing
22 as the other one is.
23  Q.  That's what I'm saying.

**ALEXANDER v BORAL**          CondenseIt!™          **DEPO:QUINCY ALEXANDER**

Page 193

1 Basically what is Exhibit 6 and Exhibit 7
2 are the same?
3    A.  Yes.
4    (Whereupon, Defendants' Exhibit No.
5 8 was marked for identification purposes
6 by Mr. Rowe.)
7    Q.  (BY MR. ROWE)  Okay.  Let me
8 show you what's been marked as Exhibit 8.
9    A.  Okay.
10    Q.  And that's entitled Notice
11 of Questionnaire.  And it consists of
12 three pages, four pages.  And it to me
13 looks like the --
14    A.  The same thing.
15    Q.  -- exact same thing as
16 Exhibit 7; is that correct?
17    A.  Yes.  That's when I sent it
18 to you.
19    Q.  Okay.  So this notice
20 basically contains the same information --
21    A.  Exactly.
22    Q.  -- that we've already
23 covered in your deposition today?

Page 194

1    A.  Exactly.  With the exception
2 though of the information I put at the end
3 of what I was currently doing.
4    Q.  Okay.  Now, is this -- when
5 you say Notice of Questionnaire, it says
6 on the first page please be advised that
7 in this letter you would find the answers
8 to your questions.  And if any additional
9 questions are needed to be answered, just
10 let me know.
11    A.  Yes.
12    Q.  So --
13    A.  That's from the
14 questionnaire you had sent me.
15    Q.  So is this in response to
16 the interrogatories that were sent to you?
17    A.  You sent me the
18 questionnaire.
19    Q.  Those written questions?
20    A.  Yes.
21    Q.  Okay.
22    A.  And I tried to, you know,
23 send you this to cover everything and said

Page 195

1 if you had additional things that I
2 probably missed just to let me know.
3    Q.  Okay.  We'll talk about that
4 in a minute.  When you said earlier that
5 in this meeting you said about your pay
6 with Mr. Markovich and Mr. Thompson --
7    A.  Yes.
8    Q.  -- was it just the three of
9 you in the meeting?
10    A.  Clyde was in the meeting
11 also.
12    Q.  Okay.  And they said that
13 they brought you into the office.
14    Does that mean back to
15 plant -- is that what you're referring
16 to -- back to Plant 1?
17    A.  No.  No.  No.  When I
18 e-mailed Steve, Steve and Scott was at
19 Plant 3.  They had took over Plant 3.
20    Q.  Right.
21    A.  Like I said, we be the only
22 ones that be up at Plant 1 in the shapes
23 department.

Page 196

1    Q.  But I think you said
2 Mr. Thompson and Mr. Markovich too still
3 had responsibility for Plant 1 --
4    A.  Yes.
5    Q.  -- even though they were
6 physically --
7    A.  Exactly.
8    Q.  -- located someplace else?
9    A.  Exactly.
10    Q.  Okay.
11    A.  What happened was, like I
12 said, I sent him the e-mail.  And in
13 regards to the e-mail, in response to it
14 rather, they told Clyde to come up to
15 Plant 1, to come get me and have a meeting
16 and meet with them down at Plant 3, in the
17 office at Plant 3.
18    Q.  Okay.  And that's when they
19 said they had brought you back to Plant 1?
20    A.  Yes.  Scott -- like I said,
21 Steve wasn't talking.  Scott did all the
22 talking.  Steve never said nothing.
23    Q.  Okay.

**FREEDOM COURT REPORTING    (334) 300-3832**          Page 193 - Page 196

Page 197

1    A.  Scott said, well, we brought
2  you back to Plant 1 because, you know, I
3  know you got the bad knees, Brother, and I
4  brought you back there, you know, trying
5  to help you out.
6    Q.  Okay.
7    A.  That's when I let him --
8    Q.  Back to Plant 1 meaning in
9  March of '05 --
10    A.  Exactly.
11    Q.  -- doing inventory and the
12  things that you've testified to?
13    A.  Exactly.  And that's when I
14  was like, you didn't bring me back up
15  there because I got bad knees.  You
16  brought me there because I know how to do
17  the job.  And at that time, inventory was
18  going on anyway, and Clyde didn't know how
19  to do inventory.
20        I never taught Clyde how to
21  do the inventory.  So that's the actual,
22  the real reason you brought me back up to
23  Plant 1 is because I knew how to do the

Page 198

1  job.
2    Q.  And the reason for this was
3  because you felt that you should be
4  getting paid the same as --
5    A.  Exactly.
6    Q.  -- Clyde?
7    A.  Exactly.  I felt that I
8  should be getting supervisor pay.  I felt
9  that I should be a salaried employee.
10    Q.  Why?
11    A.  Because when I was doing the
12  job, I was over the department.
13    Q.  Okay.
14    A.  I was over the department.
15  When Scott was over the department, he was
16  a supervisor.  When Brian was over the
17  department, he was a supervisor.
18    Q.  But when you came back in
19  March of '05 --
20    A.  That's when I became --
21  that's when I became --
22    Q.  -- you said --
23    A.  -- Clyde's assistant.  I

Page 199

1  didn't request to be a salaried employee
2  then.  I didn't say nothing.  I said I
3  should be getting the same as Clyde.
4    Q.  The reason for this meeting
5  as I understand it then was because you
6  felt that --
7    A.  I inquired about my pay.
8    Q.  You were inquiring about
9  your pay --
10    A.  Exactly.
11    Q.  -- vis-a-vis because
12  Clyde --
13    A.  Because when I was at Plant
14  3 my pay dropped from 13.40 to like 10.52
15  or something.
16        So at that time I was at
17  Plant 1, Clyde and I was both getting the
18  same pay, thirteen something.  We were
19  both getting the same pay.  He was my
20  assistant.
21        When I came back from Plant 3
22  as Clyde's assistant, I thought -- I felt
23  like I should be getting the same thing he

Page 200

1  was getting since it was that he was
2  getting the same thing that I was getting
3  when I was over there.
4    Q.  And you thought that the
5  reason you were getting -- eventually, as
6  I understand what you're saying, you
7  thought then that the reason that you got
8  laid off was because you had raised this
9  issue about your pay?
10    A.  I was told that I got laid
11  off because the product wasn't selling.
12    Q.  Right.
13    A.  But the thing was I saw that
14  when I started inquiring about my pay I
15  got -- I got laid off about it, you know.
16    Q.  Okay.
17    A.  But I was told about, you
18  know.
19    Q.  That it was the product?
20    A.  The product wasn't selling.
21    Q.  Okay.
22    A.  But after I looked at the
23  fact that after I got laid off Angie was

ALEXANDER v BORAL               CondenseIt!™               DEPO:QUINCY ALEXANDER

Page 201

1 put in my position, that's when the
2 question way maybe you wasn't laying me
3 off because the product wasn't selling.
4     Q.   Okay.  So let me ask this
5 question.  You are the Quincy Alexander
6 who's filed this lawsuit --
7     A.   Yes.
8     Q.   -- against Boral?
9          And you realize that you've
10 already filed this lawsuit individually
11 against Scott Thompson?
12    A.   Yes.
13    Q.   Okay.  And in this lawsuit,
14 are you claiming that -- you're claiming
15 sex discrimination and race
16 discrimination; am I correct?
17    A.   Yes.  Yes.
18    Q.   Okay.
19    A.   All right.
20    Q.   All right.
21    A.   And discrimination for my
22 pay.
23    Q.   And for your pay?

Page 202

1     A.   Yes.  I filed for my pay
2 also.
3     Q.   Okay.  Because you felt like
4 you should have been paid the same as --
5     A.   Exactly.  Exactly.
6     Q.   -- Clyde?
7     A.   Yes.  And like I said, when
8 I went to the front-line supervisor's
9 course, I was the only hourly there.
10         And they asked me, they was
11 like, well, why are you here if you're
12 hourly?  I was like y'all tell me, you
13 know.  I said they brought me for this
14 training.  And they said you should be --
15    Q.   And that was back in 2003 or
16 2004, sometime in there?
17    A.   Yeah.
18    Q.   But when you complained or
19 said something to Scott and Steve about
20 pay --
21    A.   Exactly.
22    Q.   -- it was that you felt you
23 should have been paid the same as Clyde?

Page 203

1     A.   Exactly.
2     Q.   Okay.
3     A.   At least the same as Clyde.
4     Q.   At least the same as Clyde.
5 Well, let's talk about your claim of race
6 discrimination.
7          What is it that you claim
8 that Boral did to you because of your race
9 that was wrong?
10    A.   Okay.  I felt that if you --
11 here I am in a position and you're going
12 by seniority.  Okay.  You say this and
13 that about the product not selling.  You
14 lay me off.
15         Within a day or two, you got
16 a white female in my position.  That -- I
17 felt discriminated against.
18    Q.   Okay.
19    A.   Because for one thing, here
20 I am -- I am senior to that person, you
21 know.  And she is the person in the
22 position.  Now, that -- that's why I said
23 race discrimination.

Page 204

1          At the same time, every time
2 something came within the company with
3 Angie or it was something going to go
4 against Angie per se -- I think when Neil
5 Ruth came down and said there were going
6 to be some changes, this and that, Scott
7 came back to me and Clyde and told us,
8 well, look.  I'm going to have to -- Isaac
9 Fleming was going to be -- something, he
10 got to move or be laid off.  He got like
11 thirty something years there.
12         Henry Wilson.  He was going
13 to have to move or go to a different
14 department or something.  And I think he
15 had fourteen years at that time.
16         He said, well, we don't have
17 anywhere to put Angie, but I'm going to
18 put her back here with y'all so she can
19 take, you know, up some of y'all's
20 responsibilities because I don't want to
21 lay her off.  I don't want to move her.
22    Q.   And this was back in 2001 or
23 so, right?

ALEXANDER v BORAL          CondenseIt!™          DEPO:QUINCY ALEXANDER

Page 205

1    A.   That's when the thing was
2  happening about the aberson I think -- not
3  the aberson, debeor -- the debeor wasn't
4  running.  It wasn't doing its --
5    Q.   It's been years ago?
6    A.   Approximately.  I'll say it
7  was -- it was -- it was before the first
8  layoff.  It was before the first layoff.
9    Q.   Okay.
10    A.   It seemed like every time
11  things came up with Angie, Scott would
12  find somewhere for Angie to be.  Now,
13  instead of --
14    Q.   Now, let me see if I get
15  this right.  The reason for the race
16  discrimination claim is because Angie is
17  white, and you're African-American?
18    A.   Exactly.
19    Q.   That's it?  That's the
20  whole -- that's what this claim is?
21    A.   Exactly.
22    Q.   Okay.  And I'm not
23  suggesting that anything was said, but I

Page 206

1  have to ask this question.  And I got from
2  your testimony that during the time that
3  you worked at Boral nothing was ever said
4  racially towards you or otherwise?
5    A.   Robert Thompson told me one
6  time -- this is while we were at Boral.  I
7  mean, when they had -- when they had -- we
8  had a -- what it was?
9        It was something that we had
10  fried turkey down at Plant 3.  We had
11  fried turkey down at Plant 3.  And -- and
12  Robby told me that, he said that he left
13  from down at Plant 3 because he got pissed
14  off.
15        And I asked him what did you
16  get mad about.  And he said Scott told
17  him, he said something like to the point
18  that I want you to go ahead and serve that
19  food because they -- they going to eat it
20  up.  They not going to save none for
21  nobody.  Look at them, like that.
22        As far as anything else, I
23  personally didn't hear anything.  And I

Page 207

1  didn't hear that.  Robby told me that
2  Scott said that.
3    Q.   There was nothing that was
4  said directly to you racially?
5    A.   No.  No.  No.
6    Q.   And, again, by my question
7  I'm not suggesting that there was.
8    A.   No.
9    Q.   I think what it is as I
10  understand your race claim is Angie is
11  white, you're African-American, you got
12  laid off, and she didn't?
13    A.   And I was in a higher
14  position than she was.
15    Q.   Okay.  And who is it, is
16  there anybody in particular that you felt
17  discriminated against you at Boral because
18  of your race?
19    A.   I -- I felt that it was
20  Scott in that particular at that -- in
21  that particular event.  In that issue,
22  that was Scott.  Because like I said,
23  Steve Markovich never told us anything

Page 208

1  about a layoff.
2    Q.   Well, if I told you that
3  Scott Thompson did not make that decision
4  as to who was going to be laid off, would
5  that change?
6    A.   That would make me add names
7  to my list.
8    Q.   Okay.  But would it take him
9  off the list?
10    A.   I -- I -- he told me.  I
11  can't -- he the one that told me that it
12  was going on.  I can't take him off the
13  list because he told me.
14    Q.   So it's simply because --
15    A.   It's like this.
16    Q.   Let me finish my question,
17  and then you can answer.  So as I
18  understand what you're saying is that you
19  think Scott Thompson discriminated against
20  you because of your race in that --
21    A.   Particular issue.
22    Q.   -- in that particular issue
23  in that Angie Curley was not laid off and

**ALEXANDER v BORAL**          CondenseIt!™          **DEPO:QUINCY ALEXANDER**

Page 209

1 you were; and the reason you think that
2 Scott Thompson discriminated against you
3 because of your race in that instance was
4 because he told you about the layoff?
5     A.   And at the same time, it's
6 because every time events occurred where
7 Angie would be involved and something is
8 going to happen with Angie it seemed like
9 Scott is going to tuck her in and make
10 sure that she be taken care of.
11     Q.   Okay.  But there was nothing
12 ever particularly said racially or
13 otherwise --
14     A.   No.
15     Q.   -- by Scott towards you?
16     A.   No.  No.  No.
17     Q.   And other than your
18 perception of these events of his
19 involvement --
20     A.   Exactly.
21     Q.   -- that's all you've got?
22     A.   Exactly.
23     Q.   Now, let's go to your claim

Page 210

1 of sex discrimination because that's
2 alleged in this lawsuit too.
3     A.   She's a female and I'm a
4 male.
5     Q.   So it is the very same
6 thing?
7     A.   (Nodding head.)
8     Q.   She's a female, you're a
9 male?  And she being Angie Curley?
10     A.   Correctly.
11     Q.   You got laid off and she
12 didn't; so, therefore, you think it's sex
13 discrimination?
14     A.   There -- there were things
15 happening around the plant that I mean --
16 being -- being a human being, I mean, it's
17 not like -- like, I'm trying to give you
18 an example of, you know, like if you know
19 someone and your eyes don't -- I know they
20 say your eyes can fool you, you know.  I
21 know that.
22          But at the same time, I mean,
23 you being a person of age, you like I got

Page 211

1 experience to know there is something
2 going on right here, you know.  It's -- I
3 got a hunch that there was really
4 something going on right here so to speak.
5          Like I said, there were a lot
6 of things that took place that you -- you
7 say that every time something is going on
8 Angie be the one taken care of.  Angie be
9 the one taken care of.
10          Like I said with Isaac
11 Fleming who had thirty-five years and
12 Henry Wilson had fourteen years, you know,
13 at the same time Angie retained her
14 position.
15          He'd find places for Angie to
16 be instead of -- and those two particular
17 guys are African-American also.
18          Every time something come up
19 with Angie, you know, she can't be wrong.
20 Or like I say, he's going to take care of
21 Angie, you know.
22          That's what led me to believe
23 that this -- this particular thing.  Now,

Page 212

1 there are employees that have seen Angie
2 and Scott together outside the workplace.
3 But, you know, you can't say you've seen
4 them doing anything.  There's nothing
5 wrong with seeing people.
6     Q.   So when you're saying that,
7 you think that something was going on
8 between the two of them?
9     A.   Personally, I do.
10     Q.   Well, do you have any direct
11 knowledge of that?
12     A.   No.  No.  That's why I say I
13 can't say that, you know, I see this or
14 anything like that.
15     Q.   Well, other than the fact
16 that she was not laid off and you were
17 laid off, she's female and you're male, do
18 you have any other reason to think that
19 you were discriminated against because of
20 your sex?
21     A.   Like I said, Scott was
22 taking care of Angie.  Anywhere he go, per
23 se when Scott got assistant plant manager,

Page 213

1 Angie moved up to the front office with
2 Scott.
3        When Scott when down to Plant
4 3, Angie moved to Plant 3 with Scott.
5 Everytime something goes on, Scott and
6 Angie is involved.
7    Q.   And remember I asked you
8 earlier in your deposition, and I'll just
9 ask it again now here, that you really
10 don't know what jobs she was doing in the
11 plant?
12    A.   David told me Angie was
13 doing administrative work for Scott.
14    Q.   But other than what David
15 told you, you specifically don't know?
16    A.   He's the personnel manager.
17 That's what I got to go by.
18    Q.   But you personally don't
19 know --
20    A.   No.  No.  No.  No.
21    Q.   -- what positions she
22 held --
23    A.   No.  No.

Page 214

1    Q.   -- and what jobs she was
2 doing?
3    A.   No.  The only thing I can
4 tell you, the thing that Robby told me was
5 when he got interviewed for the
6 maintenance job, he said that was Angie's
7 job at Plant 3 at that time.
8    Q.   Well, you knew she was in
9 maintenance then at one point in time?
10    A.   Yes.
11    Q.   And you had never been in
12 maintenance before?
13    A.   No.
14    Q.   Okay.  So is there anybody
15 in particular that you think discriminated
16 against you because of your sex, male?
17    A.   As far as me being a male?
18 Like I said, Scott Thompson did the thing
19 with Angie Curley whereas he gave her --
20    Q.   And, again, this all gets
21 back to insofar as your layoff that
22 Mr. Thompson is the one who told you about
23 your layoff?

Page 215

1    A.   Mr. Thompson told me about
2 my layoff.  The first layoff we had David
3 Hay came and told us about the layoff.
4        The second layoff we did,
5 David wasn't nowhere around telling us
6 about a layoff.  It was Scott.
7        So if -- if -- if -- when
8 David told us about the layoff the first
9 time, David told us the actions and things
10 that was going to take place and those
11 were the exact things that took place.
12 Who did the layoff?  I would think David
13 would do the layoff.
14        If Scott come back and tell
15 me the next time David is nowhere around,
16 Steve Markovich is nowhere around,
17 obviously Scott did the layoff.
18    Q.   Again, you really don't know
19 who made the decisions with respect to the
20 reduction in force; you just told know who
21 told you?
22    A.   Who told me.
23    Q.   And that's why Scott is in

Page 216

1 this lawsuit?
2    A.   Yes.  Because Scott said,
3 well, I'm about to make some changes.
4 Steve Markovich said there were changes
5 about to be made.
6        And then Scott said I'm about
7 to make some changes.  The product ain't
8 selling.  We going to have to lay off some
9 people, got to let some people go.  The
10 one position open.  That's how it came
11 down to us.
12    Q.   And back to the gender or
13 sex discrimination claim, at the time you
14 were laid off, Robby or Robert Thompson
15 was laid off too?
16    A.   Exactly.
17    Q.   And he had more --
18    A.   Seniority.
19    Q.   -- quote seniority than
20 Angie Curley?
21    A.   Yes.
22    Q.   Okay.
23    A.   But he did state -- like I

ALEXANDER v BORAL       CondenseIt!™       DEPO:QUINCY ALEXANDER

Page 217

1 said, he did state that he was interviewed
2 for her job --
3     Q.  Okay.
4     A.  -- before he was laid off.
5     Q.  Were there any other females
6 at Plant 1?
7     A.  No.
8     Q.  Were there any other females
9 at Plant 3?
10     A.  You talking about before?
11 Or just at that particular time?
12     Q.  At that particular time.
13     A.  Angie. Angie was the only
14 female.
15     Q.  Okay. With respect to
16 your -- well, let me back up. You had
17 mentioned earlier in your testimony that
18 you filed a charge of discrimination with
19 the EEOC, correct?
20     A.  Yes.
21     (Whereupon, Defendants' Exhibit No.
22 9 was marked for identification purposes
23 by Mr. Rowe.)

Page 218

1     Q.  (BY MR. ROWE) I'm going to
2 show you what's been marked as Exhibit 9.
3 And I'm going to ask you if that's the
4 charge of discrimination you filed with,
5 or a copy of the charge of discrimination
6 you filed with EEOC.
7     A.  Yes. That's -- that's not
8 the only thing I filed. It's got just
9 discrimination -- well, it's got race and
10 sex. But I had filed for -- about my pay
11 and all that too.
12     Q.  Okay. Well, this is the
13 only charge that was ever sent to Boral.
14     A.  But if you look on that
15 sheet -- I got the sheets at home. On
16 the -- on the sheet that you fill out for
17 the EEOC, I got -- she got it marked down
18 there as far as additional you got it for
19 the pay and all that also.
20     Q.  So the pay you're talking
21 about is that you felt --
22     A.  The pay that I didn't
23 receive.

Page 219

1     Q.  You felt like you should
2 have gotten the same pay as Clyde Davis?
3     A.  I should have got the same
4 pay as Clyde Davis. And at this same
5 time, Boral's rule book stated if you work
6 in a position I think -- I think it's
7 like -- if you work in that position for a
8 couple of hours or so, you should get that
9 pay in that position.
10     And, whereas, I was working
11 in a supervisor's position for a couple
12 of -- a few years or so, and I never did
13 receive that pay. So that's -- that's --
14 that's why I said for my pay also.
15     Q.  Okay.
16     A.  And, of course, like I said,
17 when Clyde was my assistant, he was making
18 the same thing I was.
19     And when I went to being his
20 assistant, I still didn't get that pay
21 back also, even that lead pay.
22     Q.  Well, let's look at Exhibit
23 9.

Page 220

1     A.  (Witness complying.)
2     Q.  And you said that you do
3 have papers that you filed --
4     A.  Yes.
5     Q.  -- with the EEOC --
6     A.  Yes.
7     Q.  -- other than Exhibit 9?
8     A.  Yes.
9     Q.  Okay. You state in here --
10 well, let me back up. This charge toward
11 the bottom of the page in Exhibit 9, in
12 parentheses it says original filed
13 2/21/2006.
14     Do you have whatever the
15 original is that's referenced there? Do
16 you have a copy of that?
17     A.  What? This?
18     Q.  Yes.
19     A.  The way -- the way that -- I
20 see it right here.
21     Q.  So you see where this says
22 right here original filed 2/21/06.
23     A.  No. No. No, I don't.

**ALEXANDER v BORAL**          Condenselt!™          **DEPO:QUINCY ALEXANDER**

Page 221

1    Q.  Do you have that original
2  whatever it is?
3    A.  No.  The sheets that I have
4  are like the green and white papers from
5  the EEOC.
6    Q.  All right.  Well, is that
7  your signature that appears at the
8  bottom --
9    A.  Yes.
10    Q.  -- of Exhibit 9?  It looks
11  like it's dated September 6th, 2006,
12  correct?
13    A.  Yes.
14    Q.  Okay.  And have we covered
15  in your deposition today all the reasons
16  why you filed this charge?
17    A.  Have we covered it?
18    Q.  Yes.  Is there any other
19  reason?
20    A.  Well, I told you about the
21  pay.
22    Q.  Okay.
23    A.  But we've covered that in

Page 222

1  your deposition today.
2    A.  Yes.
3    Q.  What you felt was the pay?
4    A.  Yes.
5    Q.  And that is you felt you
6  should have gotten the same pay as Clyde?
7    A.  And I felt that I should
8  have got the supervisor pay, and at least
9  the pay as Clyde.
10    Q.  And the supervisor's pay
11  relates all the way back to --
12    A.  When I started, took over
13  the shapes department.
14    Q.  In 2002 or 2003?
15    A.  Yes.
16    Q.  Okay.  And looking at
17  paragraph one, let's see.  Let me ask you
18  this.  You state in January, 2006, I was
19  laid off while white and female employees
20  with less seniority were maintained.
21         And is that -- I just want to
22  know who those employees are.  Is that
23  Angie Curley?  Is that who you are talking

Page 223

1  about here?
2    A.  Yes.  Yes.
3    Q.  So it's just one employee;
4  it's Angie Curley?
5    A.  Yes, sir.
6    Q.  Okay.  And paragraph two,
7  we've already covered that in your
8  deposition as to what you said Scott
9  Thompson told you --
10    A.  Yes.
11    Q.  -- at the time of the
12  layoff?  And as I understand this charge,
13  you're claiming --
14    A.  You see, it says Equal Pay
15  Act and all that in the third paragraph?
16    Q.  Okay.
17    A.  Equal Pay Act.  And
18  discrimination, Americans with Disability
19  Act.  Those are the three -- those are the
20  three things.
21    Q.  Okay.  That's what I was
22  going to ask you about.  We've covered
23  race.  And we've covered sex.  And that's

Page 224

1  because Angie's white and --
2    A.  Exactly.
3    Q.  And Angie's female?
4    A.  Yes.
5    Q.  And she stayed, and you got
6  laid off?
7    A.  Yes.
8    Q.  That's what this case is
9  about?
10    A.  And also the pay.
11    Q.  I'm going to get to that.
12  But the race and sex part, it's about
13  that?
14    A.  Yes.
15    Q.  It also makes reference to
16  disability.  And is the disability the
17  Service disability that you've been
18  describing?
19    A.  Yes.
20    Q.  Okay.  And that you had when
21  you started your employment and that you
22  had throughout your employment?
23    A.  See, when I first started

**FREEDOM COURT REPORTING    (334) 300-3832**          Page 221 - Page 224

**ALEXANDER v BORAL**          CondenseIt!™          **DEPO:QUINCY ALEXANDER**

Page 225

1 Boral, when I first started Boral, I
2 wasn't getting disability from the
3 military.
4        I had filed it when I got
5 out. Like I said, I filed in April of '97
6 when I got out of the military.
7    Q.  Yes.
8    A.  I didn't start receiving it
9 until shortly after I got at Boral.
10   Q.  But whatever disability you
11 had, you had when you started at Boral?
12   A.  No.  No.  Well, yes.  My
13 physical disability.
14   Q.  Yes.  You see what I'm
15 saying?  That didn't change?
16   A.  Exactly.
17   Q.  But you filed for it and --
18   A.  Started getting it after I
19 got hired at Boral.
20   Q.  Right.  But whatever was
21 wrong with you from a Service standpoint
22 was throughout your entire --
23   A.  Exactly.

Page 226

1    Q.  -- employment?
2    A.  Exactly.
3    Q.  And nobody ever told you
4 that you were being laid off because of
5 any disability?
6    A.  No.
7    Q.  Okay.
8    A.  No.  The only thing I say is
9 that, you know, you know, when Scott told
10 me about, you know, we putting you in the
11 office because of your knees.
12        And I like you, you know,
13 you're not putting me in there because of
14 my knees.
15        And like I say, those
16 statements like, you know, if I complain
17 about my knee hurting or my back hurting,
18 well, you can go across the railroad.  You
19 can go home.  You can go home, Brother,
20 that kind of stuff.
21   Q.  But those comments that you
22 said were made to you about the railroad
23 tracks were long before you got laid off?

Page 227

1    A.  Yes.
2    Q.  Okay.
3    A.  Yes.
4    Q.  And the comment about being
5 in the office because of your knees or
6 coming back to Plant 1 was back in -- was
7 when you were talking about your pay; is
8 that correct?
9    A.  That's -- that's -- see, all
10 that when I was talking about the pay and
11 the comment about my knees happened within
12 2005 and when I got laid off in 2006.
13   Q.  But the disability that
14 you're talking about here has to do with
15 the Service-related disability --
16   A.  Yes.
17   Q.  -- with your knees and your
18 back?
19   A.  Yes.
20   Q.  And for which you are
21 receiving compensation from the military?
22   A.  Yes.
23   Q.  And which as you've said in

Page 228

1 these documents here never prevented you
2 or hampered you or in any way restricted
3 you from doing your work at Boral?
4    A.  No.  No.  No.  No.
5    Q.  Okay.  Now, you did make
6 reference in the chrage to the Equal Pay
7 Act of 1963.  Do you know what that is?
8    A.  Equal Pay Act?
9    Q.  Yes.
10   A.  The only thing they
11 explained to me about the Equal Pay Act
12 was if you're equal -- I mean, equal pay.
13        I really didn't know.  The
14 only thing they explained to me at the
15 EEOC was when you're not receiving the pay
16 that you think you're supposed to be
17 getting, you can file under the Equal Pay
18 Act.
19   Q.  Okay.  And your complaint
20 was I felt like I should have been getting
21 paid the same as Clyde?
22   A.  During the time I was his
23 assistant.  I felt I should be getting

ALEXANDER v BORAL                CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 233

1    So at that time -- and that's
2 when at the end of her investigation, she
3 told me that -- she put in writing that
4 she don't -- well, she said there's not
5 enough evidence that she think to say that
6 yes, I was discriminated against.
7    However, she said that
8 doesn't mean that -- that doesn't mean
9 that Boral didn't have like some kind
10 of -- they didn't do something a little
11 wrong or didn't go by every procedure they
12 should have gone by.  That's what she
13 said.
14    I can still -- I can still --
15 I have so long after I got that letter to
16 actually file for a lawsuit.
17    (Whereupon, Defendants' Exhibit No.
18 10 was marked for identification purposes
19 by Mr. Rowe.)
20    Q.   (BY MR. ROWE) Let me show
21 you what's been marked as Exhibit 10,
22 which is a document from the EEOC dated
23 April 4th, 2007.  And it's called

Page 234

1 Dismissal and Notice of Rights.
2    And it states or at least the
3 box is checked, the EEOC issues the
4 following determination:  Based on its
5 investigation, the EEOC is unable to
6 conclude that the information obtained
7 establishes violations of the statutes.
8    Is that the letter that
9 you're referring to?
10   A.   Yes.
11   Q.   And you received that?
12   A.   Yes.
13   Q.   So the EEOC concluded that
14 there was nothing in its investigation to
15 establish any statutory violations?
16   A.   Yes.  But they did say that
17 that does not certify that the respondent
18 is in compliance with the statutes.
19   Q.   Right.
20   A.   Exactly.
21   Q.   I understand.  But its
22 investigation didn't find anything wrong?
23   A.   No.  She didn't -- she

Page 235

1 didn't find enough wrong.  She didn't say
2 she didn't find anything wrong.
3    Q.   Okay.  Well, does this say
4 they found anything wrong?
5    A.   She said that.
6    Q.   I mean, does the paper say,
7 Exhibit 10, that the company did anything
8 wrong?
9    A.   It says that the company
10 does not -- it does not certify that the
11 company is in compliance with their
12 statutes.
13   Q.   But does it say the company
14 did anything wrong?
15   A.   It doesn't say the company
16 didn't either.
17   Q.   Just answer my question.
18 Does it say that the company did anything
19 wrong?
20   A.   I got to answer that
21 question with a question.
22   Q.   Can you question that answer
23 yes or no?

Page 236

1    A.   No, I can't answer that
2 question yes or no.
3    Q.   Okay.  Show me where you
4 think in this letter that the EEOC found
5 that the company did anything that was
6 wrong?
7    A.   Where she says this does not
8 certify that the respondent is not in
9 compliance with the statutes.
10   Q.   Okay.
11   A.   That's telling me that
12 she -- that's telling me that she may have
13 not found enough evidence, but she did
14 find something.
15   Q.   Okay.  But that's how you
16 read that?
17   A.   Yes, of course.
18   Q.   Okay.  And the EEOC
19 dismissed the case, correct?
20   A.   Yes.
21   Q.   Then after that dismissal,
22 then did you file this lawsuit complaint?
23   A.   Yes.

**ALEXANDER v BORAL**          CondenseIt!™          **DEPO:QUINCY ALEXANDER**

Page 237

1  (Whereupon, Defendants' Exhibit No.
2  11 was marked for identification purposes
3  by Mr. Rowe.)
4    Q.  (BY MR. ROWE) Let me show
5  you what's been marked as Exhibit 11,
6  which is a copy of the lawsuit complaint
7  in this case.  It looks like it was filed
8  June 29th, 2007.
9    And I'll ask you first to
10  look at page four of Exhibit 11.  And is
11  that your signature that appears there?
12    A.  Yes.  That's my signature.
13    Q.  Okay.  Did anybody assist
14  you in writing this complaint?
15    A.  Yes.
16    Q.  Who assisted you?
17    A.  I was -- I was dealing with
18  a law office at that time.  Oh, my God.
19  Kennedy -- what's her name?  Ms. Kennedy.
20  Gwendolyn Kennedy.
21    She said -- what she said was
22  she would do the letter for me.  And she
23  will help me with the letter and whatnot.

Page 238

1  But she said she had issues with Phenix
2  City and that she wouldn't want to try to
3  do anything in Phenix City because she
4  didn't like it.  It's a close knit thing
5  going on in that area.  She don't want to
6  be dealing with Phenix City.
7    Q.  Okay.  So who wrote this
8  complaint, Exhibit 11?
9    A.  I actually told them my
10  complaint, and they typed it up for me.
11    Q.  So somebody typed it up for
12  you?
13    A.  Typed it up for me.
14    Q.  But, again, you're not
15  represented by counsel in this case?
16    A.  No.  No.  No.  No.  No.
17    Q.  And this person was -- was
18  this person representing you at the time
19  or not?
20    A.  No.  No.
21    Q.  This person never did
22  represent you in the case?
23    A.  No.  No.  No.

Page 239

1    Q.  Okay.  Let me ask you a
2  couple of questions.  It looks to me like
3  again the basis for this lawsuit, if you
4  look at paragraph two, is a complaint of
5  race discrimination, does it not?
6    A.  Paragraph two?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Okay.  That's what this
10  complaint is is race discrimination?
11    A.  Yes.  But that's not the
12  only thing.  As I stated earlier, that was
13  about the Equal Pay Act and the
14  discrimination also.
15    Q.  Okay.
16    A.  I mean, the Disability Act
17  also.
18    Q.  Well, there's an interesting
19  statement in paragraph one.  This is an
20  action for legal and equitable relief to
21  remedy unlawful discrimination in
22  employment on the basis of race and to
23  remedy sexual harassment in the workplace.

Page 240

1    Do you claim that you were
2  sexually harassed in the workplace?
3    A.  No.
4    Q.  Okay.  Let's look at
5  paragraph six.
6    A.  (Witness complying.)
7    Q.  There's a reference to
8  Caucasian and female employees with less
9  seniority.  Again, is the reference there
10  to Angie Curley?
11    A.  Yes.  Yes.
12    Q.  That's who you are talking
13  about?
14    A.  Yes.
15    Q.  Okay.  And paragraph eight
16  makes reference to --
17    A.  Scott Thompson.
18    Q.  -- Scott Thompson as
19  assistant plant manager.  And the reason
20  that he's in this lawsuit is because he's
21  the one that told you that you were being
22  laid off, right?
23    A.  Yes.

**ALEXANDER v BORAL**            CondenseIt!™            **DEPO:QUINCY ALEXANDER**

Page 245

1 those retained were non-disabled.
2      A.   I don't even understand
3 that.
4      Q.   I don't either.  And you
5 don't know the basis for that statement,
6 do you?
7      A.   No.
8      Q.   Okay.  And you state in
9 paragraph 13 that you were --
10     A.   Discriminated by defendant
11 in the discharge.
12     Q.   In the discharge.  And that
13 has to do with the reduction.  And you say
14 you were discharged because you're an
15 African-American male and as I think
16 you've said --
17     A.   Because of the disability.
18     Q.   Well, I'm going to get to
19 that.  -- because African-Amercan male.
20 And that references the fact that you said
21 Angie Taylor --
22     A.   Curley.
23     Q.   -- Angie Curley was not laid

Page 246

1 off and you got laid off?
2      A.   Yes.
3      Q.   That's it?  That's the basis
4 on that statement?
5      A.   Yes.
6      Q.   And then you say that you
7 were discharged because of your
8 disability.  But nobody ever told you that
9 your disability had anything to do with
10 it.
11         In fact, you were never
12 hampered in your work at Boral because of
13 any alleged disability, correct?
14     A.   No.
15     Q.   Okay.  Now, here's the one
16 that really threw me.  Look at the last
17 page of paragraph four.
18     A.   (Witness complying.)
19     Q.   And read the verification to
20 me.
21     A.   Yes.  I, Roderick Steele,
22 yeah.
23     Q.   Who is Roderick Steele?

Page 247

1      A.   That -- that I don't know.
2 I don't know.
3      Q.   Okay.
4      A.   Like I said, I received
5 something from the Court with another name
6 on it that said --
7      Q.   Yeah.  But this is something
8 you signed and verified, correct?
9      A.   Exactly.
10     Q.   Okay.  Let me ask you this.
11 At the time you were laid off, Robert
12 Thompson was the laid off at the same
13 time, correct?
14     A.   Yes.
15     Q.   And he is white?
16     A.   Yes.
17     Q.   Correct?
18     A.   Yes.
19     Q.   And at the time you were
20 laid off, others at Plant 1 were not laid
21 off including African-Americans, correct?
22     A.   Of course.
23     Q.   Okay.  And I think we've

Page 248

1 covered this in your deposition, but the
2 only people that you've -- as I understand
3 it, and correct me if I'm wrong -- but the
4 only people current or former Boral
5 employees that you've talked with
6 concerning your complaint or claim of
7 discrimination are Robert Thompson, Jerry
8 Jones and Larry Joseph?
9      A.   Yes.
10     Q.   That's it?  Nobody else?
11     A.   No.
12     Q.   And you have no written
13 statements from any of those
14 individuals --
15     A.   No.  No.
16     Q.   -- with respect to these
17 matters?
18     A.   No.  No.
19     Q.   And you've told me about
20 what federal and state income tax returns;
21 you may have your 2005 and 2006?
22     A.   I'm -- I'm -- I may have
23 them.

**ALEXANDER v BORAL**    CondenseIt!™    **DEPO:QUINCY ALEXANDER**

Page 249

1    Q.  Okay.
2    A.  Can I ask you a question?
3  What they got to do with this?  What my
4  income got to do with it?
5    Q.  Well, what are you seeking
6  in this case?
7    A.  I mean, I'm seeking -- what
8  I'm seeking in this case is justice as far
9  as, you know, I think I should have got
10  that pay.
11      I think I should have got
12  that pay for -- for my time of being
13  equal -- as far as being equal as far as
14  getting paid for what I was doing.
15      Because that was one of
16  Boral's rules.  If you're in that
17  position, you're supposed to get that pay,
18  you know.
19      And at that time, as far as
20  discrimination -- as far as
21  discrimination, I'm seeking anything that
22  I should be able to get for
23  discrimination.

Page 250

1      Because of -- because of me
2  not having that job, you know, I've --
3  I've fell behind on my child support, you
4  know.  I've fell behind on another bill.
5      Of course, with me being that
6  way, it comes stress.  It gets stressful.
7  I mean, you know, at home, I mean, it's
8  just pain and suffering, you know.
9      At the same time, I -- I --
10  what I want most is for Boral to recognize
11  you can't do people any kind of way, you
12  know.
13      I want Boral to recognize
14  and -- and get the people within that
15  company to not do stuff like that.
16      You know, it's -- it's not
17  about -- it's not about money.  It's about
18  being equal.  It's about people shouldn't
19  let things just -- just -- just go
20  unnoticed.
21      You know, Boral shouldn't --
22  Boral should do away with people that have
23  that kind of stuff in their heart to be

Page 251

1  that way, discriminate against people.
2  Anybody.  It's not just Boral.  That's
3  throughout the world, you know.
4    Q.  But the person at Boral you
5  think discriminated against you was Scott?
6    A.  I would -- I would think
7  it's Scott Thompson.  But at the same time
8  with you asking the question that you're
9  asking that Scott didn't -- was it Scott
10  that did it, I don't know whether Scott
11  did it or not.
12      It raises a question of me of
13  whether I should add more people in the
14  thing as far as doing it.  Because I would
15  add people over Scott.  I would add people
16  that had everything to do with the
17  hiring -- hiring and laying off within the
18  company.
19      Because that's telling me
20  that everybody in the company, whoever in
21  the company that's over hiring and laying
22  off, doing that, that's telling me they
23  should have some kind of knowledge of it.

Page 252

1      And if they thought it was
2  wrong or whatnot and just let it happen,
3  that means I should go after them also.
4  That's why I said Boral Brick.
5    Q.  Okay.
6    A.  I particularly named Scott
7  Thompson because he's the one that told
8  me.
9    Q.  Okay.  Well, besides the tax
10  returns, you mentioned that you had
11  documentation that you had given to --
12  copies of information that you had given
13  to the EEOC, information from the post
14  office with respect to jobs and other
15  things that we've mentioned in your --
16  other pieces of paper?
17    A.  Yes.
18    Q.  Okay.
19      (Whereupon, Defendants' Exhibit No.
20  12 was marked for identification purposes
21  by Mr. Rowe.)
22    Q.  (BY MR. ROWE)  I'm going to
23  hand you now what's been marked as Exhibit

**FREEDOM COURT REPORTING**    (334) 300-3832    Page 249 - Page 252

ALEXANDER v BORAL                 CondenseIt!™                DEPO:QUINCY ALEXANDER

Page 261

1 Defendants' Exhibit 13, and Defendants'
2 Exhibit 13 is Defendants' First Request
3 for Production of Documents.
4        This was already served with
5 the written questions.  You remember
6 receiving this; is that correct?
7    A.  Do I remember receiving
8 this?
9    Q.  Yes.  It was sent at the
10 same time as Exhibit 12.
11    A.  I'm not sure.  I'm not sure.
12 I probably have, but I'm not sure.
13    Q.  Okay.  But in any event, you
14 haven't provided to me as attorney for the
15 defendants any documents in this case,
16 have you?
17    A.  No.  I haven't provided an
18 attorney, no.
19    Q.  And this request for
20 production asks for any documents that
21 fall within these requests.  So I'm going
22 to ask you again to -- and I'll give you
23 another copy of this, to look at this and

Page 263

1 do my medical records have to do with
2 this?
3    Q.  Well, because although the
4 company denies that, one, you're disabled
5 within the meaning of the law or, two,
6 that you have any claim for disability
7 discrimination, you've raised that issue.
8    A.  What?  About my disability?
9    Q.  Yes.
10    A.  I don't have disability with
11 the company.
12    Q.  If you want to withdraw that
13 claim of disability discrimination --
14    A.  I mean, you can see my
15 records.  I don't mind.  I don't mind you
16 seeing my records.
17    Q.  That's why that question is
18 asked.
19    A.  Okay.
20    Q.  But you will read through --
21 I'd ask to you read through this request.
22 And, again, you've identified certain
23 documents today that you said you would

Page 262

1 provide any documents.
2        Because several things that
3 you've identified in your deposition today
4 are responsive to this.
5    A.  Okay.
6    Q.  For example, Request No. 5
7 asks for documents that you either
8 received from or provided to any federal,
9 state or local agency relating to your
10 employment.  And that would include the
11 EEOC.
12        Request No. 6 requests
13 documents concerning any damages that you
14 claim in this case.
15        Request No. 8 asks for your
16 tax returns.
17    A.  I probably -- like I say, I
18 may or may not have those --
19    Q.  And for example --
20    A.  -- W-2s.
21    Q.  -- Request No. 10 asks for
22 medical records as does Request No. 12.
23    A.  Now, my question is:  What

Page 264

1 provide to me that fall within the scope
2 of this request and any other documents.
3    A.  Okay.
4    Q.  And I'm going to reserve the
5 right to resume the deposition upon
6 receiving those documents since I didn't
7 have them prior to the deposition today.
8    A.  Okay.
9        MR. ROWE:  Off the Record.
10        (Off-the-Record discussion
11 and short break.)
12    Q.  (BY MR. ROWE)  A couple
13 other questions, Mr. Alexander, and then
14 we'll be finished.  When you were on
15 unemployment, did you have to seek work to
16 retain the ability to get unemployment?
17    A.  Of course.
18    Q.  Okay.  And have you told me
19 about all of your job searches in that
20 regard?
21    A.  Yes.
22    Q.  Okay.  And you weren't
23 restricted in the type of work you were

**ALEXANDER v BORAL**     CondenseIt!™     **DEPO:QUINCY ALEXANDER**

Page 265

1 looking for at all?
2      A.   I was looking for any kind
3 of work.
4      Q.   Any kind?
5      A.   Yeah.
6      Q.   And you felt like you were
7 able to do any kind?  You just wanted to
8 get a job to do something?
9      A.   Well, if you got to provide
10 for your family, you got to look for
11 anything that you can do.  Anything
12 that -- anybody that will hire you.
13      Q.   So you didn't feel you were
14 restricted in looking for any work?
15      A.   No.
16      Q.   Okay.  And then the last
17 question I'm going to ask you is have
18 we -- and it's part of the thing that I'm
19 supposed to do here.  Part of my job is to
20 make sure I've covered all the reasons why
21 you feel you've been discriminated against
22 and caused you to file this lawsuit.
23           Have we covered everything in

Page 266

1 your deposition today?
2      A.   As far as I know, yes.
3      Q.   Okay.  I have nothing
4 further.
5           Now, we talked a little --
6 but, again, I'm reserving the opportunity
7 to reopen the deposition  depending upon
8 what documents you provide me which have
9 earlier been requested which haven't been
10 received as of this deposition as
11 reflected in Exhibit 13 and also any
12 supplement that you might make to the
13 interrogatories, Exhibit 12.
14           Now, we've talked a little
15 bit about the procedure here.  And, again,
16 I'm not your attorney.  And I can't advise
17 you specifically.
18           But I would caution you to
19 look at the Federal rules as to
20 depositions.  Because it does outline the
21 procedure to be followed.
22           But as the reporter had
23 indicated and as I had indicated that you

Page 267

1 have the opportunity to read this
2 deposition and sign it and make
3 corrections to it.
4           But as I understand it, not
5 substantive corrections, only typos or
6 other things, spellings that you see.  You
7 can't change your testimony.
8           And the court reporter if you
9 want to read it and sign it can and will
10 send it directly to you at your home
11 address.  You all may have talked about
12 that.  I don't know.
13           And if that does take place,
14 then you have the opportunity then to as I
15 said to read it and sign it and then
16 return it to the court reporter, who will
17 file it with the Court.
18           There is a time limit which
19 she will advise you when she sends it to
20 you, the court reporter, as to when that
21 has to be done.
22           And if you don't read it and
23 sign it and return it to her within that

Page 268

1 time limit, then she I believe is
2 obligated to file it with the Court and
3 then it can be used as if you had read it
4 and signed it.  And that's called your
5 signature being waived.  Again, I'm not
6 your attorney.
7      A.   I understand.
8      Q.   I just want to make sure you
9 understand basically what we're saying.
10      A.   Yes.
11      Q.   Okay.  I've nothing further.
12 And thank you for your attendance today.
13
14  * * * * * * * * * * * * * * * *
15      FURTHER DEPONENT SAITH NOT
16  * * * * * * * * * * * * * * * *
17
18
19
20
21
22
23

# FREEDOM COURT REPORTING    269

1        **REPORTER'S CERTIFICATE**

2    STATE OF ALABAMA:

3    ELMORE COUNTY:

4                I, Rena' Messick Lanier,

5    Certified Court Reporter and Commissioner

6    for the State of Alabama at Large, do

7    hereby certify that the above and

8    foregoing transcript of the proceedings in

9    this matter was reported by me.

10                I further certify that the

11   foregoing computer-printed pages contain a

12   true and correct transcript of the

13   proceedings held in this matter.

14                I further certify that I am

15   neither of kin nor of counsel to the

16   parties to said cause, nor in any manner

17   interested in the results thereof.

18

19

20   ---------------------------

21   Rena' M. Lanier, Certified

22   Court Reporter (ABCR No. 0031)

23

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

QUINCY L. ALEXANDER,                          )
                                              )
      Plaintiff,                         )
                                              )
v.                                            )     Civil Action No. 3:07-CV-00647-WHA-TFM
                                              )
BORAL BRICKS INC. and                         )
SCOTT THOMPSON,                               )
                                              )
      Defendants.                        )

---

**AFFIDAVIT OF DAVID HAY**

---

STATE OF _ALABAMA_    )
                      ) ss
COUNTY OF _Russell_   )

    I, David Hay, declare and state under oath as follows:

    1.    My name is David Hay, and I have personal knowledge of the facts stated in this Affidavit.

    2.    I was employed by Boral Bricks Inc. ("Boral") at its Phenix City, Alabama, facility from November 1993 to November 2007.

    3.    During my tenure with Boral, I held the position of Regional Human Resources Manager.

    4.    Quincy L. Alexander was employed by Boral in the Phenix City facility beginning in June 1997 in a production, hourly-paid position.  Mr. Alexander held several production positions thereafter, and, at the time of his termination, he was assigned to the Special Shapes Department ("Shapes" or "Shapes Department") in Plant 1 at the facility.

5.    As a Shapes Maker, Mr. Alexander was responsible for weekly cycle counts and adjustments on the Shapes inventory yard, he was the Shapes counter for the annual inventory, and he entered data in the computing system.  Mr. Alexander also served as a back-up Shipper and performed shapes making functions and other tasks as assigned.

6.    Due to the declining demand for special shaped brick products, Boral reduced its work force in the Shapes Department in Plant 1 in February 2006.

7.    The reduction in force was implemented by specific department and based upon total company service.  The Shapes Department consisted of a 13-person crew at the time of the reduction.

8.    Steve Markovich (Plant Manager) and I determined that Rickey Tolliver (Black/Male), Robert Thompson (White/Male) and Mr. Alexander – the three least service employees in the Special Shapes Department – would be terminated as part of the reduction in force.  Scott Thompson, Assistant Plant Manager at Boral's Phenix City, Alabama manufacturing facility, was not involved in the decisions to implement a reduction in force, or whose employment would be terminated, but was directed to communicate the decisions to Messrs. Tolliver, Thompson and Alexander.

9.    On January 9, 2006, Scott Thompson notified the three affected employees of the reduction in force, which would be effective as of February 24, 2006.

10.    Mr. Alexander and Mr. Thompson's last day of work was February 3, 2006 because both were allowed to use accrued vacation prior to the effective date of their termination, February 24, 2006.

11.    Although he was notified of his lay-off, Mr. Tolliver had no accrued vacation and continued to work during the period of time Mr. Alexander and Mr. Thompson were using their

2

accrued vacation. During this period, openings in other departments became available and Mr. Tolliver was retained to work in the following temporary assignments: as a laborer in Plant 3; then, in a labor position located in Plant 1; next, in a labor position in the Resale Yard; and, finally, in a labor position in the Arch Department. While Mr. Tolliver was the least senior employee in Shapes, he had been previously employed by Boral for a number of years.

12.  Boral posts available full-time production positions on the company's bulletin board for a period of 48 hours, and interested Boral employees may apply during this 48 hour period. Employees selected for a reduction in force are also advised of the opportunity to bid on open production positions at the Phenix City facility.

13.  After being notified of his selection for lay-off, but prior to his effective date of termination, Mr. Alexander was advised of and given the opportunity to bid on three open positions at Phenix City; however, Mr. Alexander did not respond. Mr. Thompson was also notified of the open positions, but did not respond. I attached a note to the final pay stubs, dated February 23, 2006, of Mr. Alexander and Mr. Thompson, advising them of the opportunity to bid on the open production positions. Each note identified the jobs (Pallet Car Loader, Pallet Car Stripper and Dino Operator), which would be posted for bid on February 27-28, 2006.

14.  When Mr. Alexander failed to pick up his pay stub, I mailed the pay stub and the note reflecting the open production positions to his home address.

15.  Neither Mr. Alexander nor Mr. Thompson bid on any of the three vacant jobs.

16.  On March 9, 2006, I left telephone messages on the personal answering machines of both Mr. Alexander and Mr. Thompson, informing them of two Lift Truck positions recently posted. Mr. Thompson returned the call and said that he was not interested in the Lift Truck positions, and Mr. Alexander never returned the telephone call.

17.  After Mr. Alexander and the other Shapes employees were notified of the lay-off, Clyde Davis (Black/Male), Lead in Shapes, assumed full-time duty as a Behavioral Safety Training Coordinator in Phenix City.

18.  In order to keep Shapes running smoothly during this transitory period while Boral reduced shapes production, in early February 2006, Mr. Markovich and I assigned Angela Curley (White/Female) to cover the Lead position duties.  Ms. Curley previously worked as a Lead in Shapes from October 2001 until July 2003, and then subsequently from July 2004 until 2005. The principal Lead duties Ms. Curley assumed in February 2006 included shipping shapes, production scheduling, inventory management, mold box inventory and drawings and data entry.

19.  Not only did Ms. Curley have previous experience working as a Lead in Shapes, but also she was skilled in several disciplines outside of Shapes necessary to operations at the facility in Phenix City.  During her tenure with Boral, Ms. Curley acquired behavior safety training skills, served as Plant Safety Officer, was the back-up for payroll administration and in that role regularly performed facility payroll, and performed environmental calculations and tracked environmental records for Boral's Phenix City facility; and she continued to support Boral in these roles while assigned to cover the Lead duties in Shapes.  Ms. Curley also trained the new MRO Specialist in Centralized Maintenance, her former position, while covering the Lead duties in Shapes.

20.  In July 2006, Ms. Curley transferred to a customer service position in Gulfport, Mississippi, and there has been no Lead in the Special Shapes Department since this time.

21.  Mr. Alexander's selection for the reduction in force was based solely upon length of service.  Neither Mr. Alexander's race nor his gender had anything to do with Boral's decisions. I was unaware of any alleged disability of Mr. Alexander, but regardless Mr. Alexander's

4

termination was solely based on the decline in the demand for special shaped bricks and Mr.

Alexander's length of service.

        Further Affiant sayeth not.

                                _David Hay_____
                                David Hay

        Subscribed and sworn to before me this 3rd day of July, 2008.

                                Brenda D. Buckley
                                Notary Public

My Commission Expires: _____

```
BRENDA D. BUCKLEY
NOTARY PUBLIC-OFFICIAL SEAL
MUSCOGEE COUNTY, GEORGIA
```
My Commission Expires January 21, 2009

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| QUINCY L. ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:07-CV-00647-WHA- |
| | ) | TFM |
| BORAL BRICKS INC. and | ) | |
| SCOTT THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF STEVE MARKOVICH

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) ss |
| COUNTY OF RUSSELL | ) |

I, Steve Markovich, declare and state under oath as follows:

1.    My name is Steve Markovich, and I have personal knowledge of the facts stated in this Affidavit.

2.    Boral Bricks Inc. ("Boral") is a manufacturer of commercial and residential clay brick products and operates manufacturing facilities in Phenix City, Alabama.

3.    I am currently employed as the Plant Manager at Boral's Phenix City facility. I have held this position since before 2006.

4.    In February 2006, Boral implemented a reduction in force in the Special Shapes Department ("Shapes") as a result of the declining demand for special shaped brick products.

5.     David Hay (Regional Human Resources Manager) and I selected the Shapes employees to be terminated as part of Boral's reduction in force based upon years of service with the company, *i.e.*, the least senior employees would be terminated.

6.     Rickey Tolliver, Robert Thompson and Quincy Alexander had the least amount of seniority in Shapes, and therefore were selected for the reduction in force.

7.     At my direction, on January 9, 2006, Scott Thompson (Assistant Plant Manager) notified the three Shapes employees of the reduction in force, which would be effective on February 24, 2006. Mr. Thompson was not involved in the reduction in force decision or in the decision as to whose employment would be terminated.

8.     In early February 2006, Clyde Davis – Lead in Shapes – was transferred from Shapes to a Behavioral Safety Training Coordinator position in the Phenix City facility.

9.     In order to keep Shapes running smoothly during this transitory period while Boral reduced shapes production, Mr. Hay and I assigned Angela Curley to cover the Lead position duties. Ms. Curley had previously worked as the Lead in Shapes and in light of the variety of skills she had acquired throughout her employment with Boral, Ms. Curley was able to serve numerous functions in addition to those corresponding to the Lead position. Ms. Curley trained the MRO Specialist in Centralized Maintenance, which was her former position. In addition, Ms. Curley continued to coordinate environmental records and calculations, serve as a Plant Safety Officer, and facilitate behavioral safety training, and perform payroll administration – all while covering the Lead position in Shapes.

10.     Neither Mr. Alexander's race nor his gender was related in any respect to my decision to terminate his employment as part of Boral's reduction in force. Rather, the

2

decision was based solely on the decline in demand of special shaped bricks and Mr.

Alexander's years of service with Boral. I had no knowledge of any alleged disability of

Mr. Alexander, but regardless my decision was based solely on the decline in demand for

special shaped bricks and Mr. Alexander's years of service with Boral.

Further Affiant sayeth not.

_Steve Markovich_
Steve Markovich

Subscribed and sworn to before me this _2nd_ day of _July_, 2008.

_Brenda D. Buckley_
Notary Public

My Commission Expires: _____

BRENDA D. BUCKLEY
-NOTARY PUBLIC-OFFICIAL SEAL-
MUSCOGEE COUNTY, GEORGIA
My Commission Expires January 21, 2009

3

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

QUINCY L. ALEXANDER,                        )
                                            )
      Plaintiff,                         )
                                            )
v.                                          )  Civil Action No. 3:07-CV-00647-WHA-TFM
                                            )
BORAL BRICKS INC. and                       )
SCOTT THOMPSON,                             )
                                            )
      Defendants.                        )

### AFFIDAVIT OF SCOTT THOMPSON

STATE OF ALABAMA    )
                ) ss
COUNTY OF RUSSELL   )

     I, Scott Thompson, declare and state under oath as follows:

     1.   My name is Scott Thompson, and I have personal knowledge of the facts stated in this Affidavit.

     2.   I am currently employed as the Assistant Plant Manager at Boral Bricks Inc.'s ("Boral") Phenix City, Alabama manufacturing facility.  I have held this position since before 2006.

     3.   As the Assistant Plant Manager, I am responsible for the production operations at Plant 1, including the Special Shapes Department ("Shapes").

     4.   Pursuant to Steve Markovich's (Plant Manager) direction, on January 9, 2006, I notified three employees – Rickey Tolliver, Robert Thompson and Quincy Alexander – of their selection for a reduction in force.

5.    I played no part in Boral's decision to implement the reduction in force and I did not select which employees in Shapes would be terminated as part of the reduction in force.

6.    After the Shapes employees were informed of the lay-off, Mr. Markovich and David Hay (Regional Human Resources Manager) decided to assign Angela Curley to cover Lead position duties in Shapes following Clyde Davis' transfer out of the department.  I was not involved in that decision.

Further Affiant sayeth not.

_Scott Thompson_
Scott Thompson

Subscribed and sworn to before me this 2nd day of _July_ , 2008.

_Brenda D. Buckley_
Notary Public

My Commission Expires: _____

BRENDA D. BUCKLEY
NOTARY PUBLIC-OFFICIAL SEAL-
MUSCOGEE COUNTY, GEORGIA
My Commission Expires January 21, 2009

# EXHIBIT 5

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2006-00962 |
| | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Quincy L. Alexander | (334) 297-1281 | 01-27-1971 |

Street Address                City, State and ZIP Code

1507 - 8th Place South, Phenix City, AL 36869

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| BORAL BRICK | 500 or More | (334) 291-9303 |

Street Address                City, State and ZIP Code

100 Brickyard Rd., Phenix City, AL 36867

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 12-01-2005 | 02-24-2006 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

AMENDED

I was hired by the above employer in June 1997 as a laborer at a rate of $6.90 p/hr. Four years later, I was
promoted to a Lead person at a non-exempt rate of 13.40. In January 2006, I was laid off while White and
female employees with less seniority were maintained.

The reason given for the action was that the company was cutting back, according to Scott Thompson,
Assistant Plant Manager.

I believe I was discriminated against because of my race, Black and my sex, male, my disability in violation of
Title VII of the Civil Rights Act f 1964, as amended, the Equal Pay Act of 1963 and the Americans with
Disabilities Act of 1990, as amended

(Original Filed 02/21/2006)

| | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SEP 14 2006 |
| X 6 -Sept. 0    X *Quincy L. Alexander*  | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |



DEFENDANT'S EXHIBIT

QA 9

# EXHIBIT 6

EEOC Form 161 (10/96)                  U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Quincy L. Alexander                        From: Birmingham District Office
    1507 8ᵗʰ Place                                   1130 22ⁿᵈ Street, South
    Phenix City, Alabama 36869                       Birmingham, Alabama 35205

[  ]    *On behalf of person(s) aggrieved whose identity is*
        *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420 2006 00962 | Glenda M. Matthews, Investigator | (205) 212-2138 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[  .]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]    Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[  ]    We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]    Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]    While reasonable efforts were made to locate you, we were not able to do so.

[  ]    You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the
Commission

*Delner Franklin-Thomas*                          04/04/2007

Delner Franklin-Thomas, District Director              *(Date Mailed)*

Enclosure(s)

cc:    Leonard Gibbs
       Boral Bricks, Inc.
       200 Mansell Court East, Suite 306
       Roswell, Georgia 30076

DEFENDANT'S
EXHIBIT

QA  10