# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

2008 AUG 19 A 11: 17

QUINCY L. ALEXANDER

      DEBRA P. HACKETT, CLK
      U.S. DISTRICT COURT
      MIDDLE DISTRICT ALA

      Plaintiff,

      )
v.      )  Civil Action No. 3:07-CV-00647-WHA-TFM
      )
BORAL BRICKS INC. and      )
SCOTT THOMPSON,      )
      )
      Defendants,      )

---

## REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO PROCEED

---

I, Quincy L. Alexander, Pro se, respectfully submit my Reply Brief in Further Support of my Motion To Proceed.

### REPLY ARGUMENT

Defendants claim that I argued on their reply argument on page 3-4, paragraph 2, that a White male (unidentified) with less seniority was offered Angela Curley's position after Ms. Curley was asked to oversee the Lead responsibilities in shapes department in which I identified the White male to be <u>Robert (Robbie) Thompson</u> in previous documents in which I've enclosed and high-lighted in orange. Defendants also stated in that same paragraph on page 4, line 6, that I didn't establish my qualifications for such a position. Come now, Defendants, how can I establish qualification on a position I knew nothing about. The position wasn't posted. I only found out about the position after Robbie Thompson, himself, told me that he in fact interviewed for the inventory job in which he had no experience in. For these reasons, NO, I can't show that I am qualified for the

position with Boral Bricks at the time of my discharge. I couldn't show that, being I had

no knowledge of any position(s) being available with Boral Bricks. After Mr. Thompson

told me about the position and the requirements which consisted of warehouse **inventory**

of maintenance parts then YES, I do qualify being that I was already working in a

position where I was held accountable for a multi-million dollar **inventory** of Special

Shape Bricks. I also had previous military experience while working with fuel **inventory**

which consisted over 300,000 gals of fuel in underground tanks. Mr. Thompson also

stated that Scott told him just go through the motion but he has nothing to worry about.

Mr. Thompson was also called back to work. Why wasn't I being senior to Mr.

Thompson? I have high-lighted in green on the previously sent document in which I have

enclosed that during a previous lay off, Angie Curley and Mr. Thompson, who I was

senior to, both stayed at the plant. I inquired about this to David Hay (personnel manager)

and didn't get sufficient answers. He said Mr. Thompson was going to the Sample

Department and Ms. Curley was going to be doing work as Scott's assistant. How can

Mr. Thompson go to the Sample Department when David said there were no other

positions open. What was Angie going to be doing for Scott if the main plant was closing

and the Shapes Department in which I was running, was the only department open at

plant one. Defendants also stated on page 5, line 8 of their reply argument, that Ms.

Curley was multi-faceted and could serve Boral in various roles yet stated the same about

me at the bottom of page 6 which states his ability to work in the various positions he

held with Boral.  This alone creates an inference of discrimination.

  As per my disability, I have enclosed documents which supports my being disabled.

Defendants stated on pages 6-7 that I admit that my physical condition did not prohibited

me from doing various jobs with Boral. It didn't but that doesn't mean I wasn't in pain doing those jobs and in my disability paperwork you can see that my conditions did get worst. I went from 10% to 40% for my back alone and from 20% to 40% for both knees during the time I was with Boral. I come from a military where I served in infantry units and we had to take care of fellow soldiers. There was no such thing as complaining about being in pain and if you did you were considered a nobody in Uncle Sam's Army. You do your job and afterwards you go and say HOO-RAH, I saved a life today. After this and only after this you can go home proud from a hard day's work and look after your so called war wounds and you treat them accordingly. There were plenty of times I was in pain but didn't complain knowing I had a family to feed and at the time I was the sole provider for them. There were times, at Boral, that the pain I was in led me to wear my metal braces for both knees and times that the Assistant Plant Manager, Scott Thompson, saw me with the braces on and made statements that if I couldn't walk around the plant then I can go home. I have witness testimony to such remarks made by Mr. Thompson. No, I didn't ask for a golf cart or any other kind of assistance but I did want to be treated with dignity and respect and not be put down by my superiors especially in front of my subordinates.

As per equal pay, Boral rule book states if an employee is working in a position more than 4 hours and that position pay rate is more than that of the employee's current pay then that employee will be paid the rate of that position and if an employee is to work in a position that pays less than their current rate then they will continue to receive their current pay rate. I was working in a supervisor/management position for a minimum of 4 years and didn't get the pay. I was also sent to Boral's First Line Supervisor's Course

in Merietta,Ga to further my supervisory skills and was asked by the instructor and fellow

classmates to whom did the same or similar jobs, why was I the only hourly employee in

the course. Everyone else that attended the course were salary employees. While in the

training it was required that we all see the EOC officer of Boral in which I saw him and

asked about my pay and what I was doing and he said "Don't worry about it because I

can probably make up for it through over time." Defendants stated under title IV, page 8,

that I cannot establish a prima face case of the Equal Pay Act. That male supervisor that I

claim that I should at least get the same pay as was getting the same pay that I was

getting during my supervising him. He became my supervisor at the time of the first lay

off because he was senior to me. That is the time I was sent to another plant for a few

months and afterwards came back having the same responsibilities as I had before I left. I

taught my supervisor his job in which I did before he became my supervisor. I had further

training in the position with the First Line Supervisor Course I went to through Boral.

   This is why I am motioning for this case to proceed.

Respectfully submitted,

Quincy L. Alexander, Plaintiff, Pro se

Quincy L. Alexander
1507 8th PL So.
Phenix City, Al 36869
Telephone: (334) 297-1281
Fax: (334) 297-1281

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of Aug, 2008, the foregoing Reply Brief was served, by First Class United States mail, postage prepaid, that same date to:

Jack D. Rowe
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108

Attorney for Defendant

Quincy L. Alexander
Plaintiff Pro Se

PREVIOUS DOCUMENT

Defendant

I, Quincy Lorenzo Alexander, was employed at Boral Bricks in Phenix City, Alabama from June 19th 1997 (25 days after probation period) to Feb 24th 2006. My job title was Lead Person but I worked as Shapes Manager/Supervisor in the Special Shapes Department. Early November of 2004 we were told by Scott Thompson (Assistant Plant Manager) that the plant was shutting down and there were people who were going to be bumped of their jobs. Scott said that the Shapes Department was not shutting down but people with seniority will take jobs of other with less seniority.

At the time, I had 7years and 5 months with no one knowing the job besides Clyde Davis whom I trained and was my assistant at the same pay rate but had more seniority, and Angie Curly who had less than 5yrs at that particular time in which she wasn't working in the department.

On week ending Nov 14, 2004 Personnel Manager David Hay (Boral Bricks), told me that I was going to be bumped of my job by Scott. **(WHY WOULD AN ASSISTANT PLANT MANAGER TAKE A LEAD PERSON JOB)** It wasn't a lead person's job. It was a Supervisor's/ Manager's position. David stated that there were 6 permanent and 2 temporary positions available in which the 6 were stacking jobs and the 2 were Shape positions at others plants. I end up with one of the temporary positions. David told me taking this position will decrease my pay from 13.40 to 10.72 an hour.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ Why weren't those positions offered to me? There were people in my department

that were bumped of their jobs by others who knew nothing about the position and had to be trained by other people that were still there with experience. I asked David about this and he said that Angie was working as Scott's assistant and Robert was in the sample department. Why wasn't I offered these positions? (I never got an answer for Robert) and he told me that Angie was doing administrative work and reports for Scott. (But I was senior to her)

I worked at plant 3 in one of the temporary position at the pay rate of 10.72 from Nov 23rd 2004 to March 2005.I came back as Clyde's assistant but wasn't paid equal pay! I inquired about this to Scott Thompson and he assured me that I would get back to my old pay rate of 13.40 but it could be about a couple of weeks before I see it on my check. That never happened! I went to the Plant Manager Steve Markovich and he said that it wasn't a good idea for my pay to be changed. Afterwards, I went to David Hay and he said he didn't know I was back at that plant. He also suggested that I go back to Scott and inquire about it in which I did and nothing happened.

After the months had passed, Scott came and said that there was going to be another lay off because the product just wasn't selling. He said that there was one position open at another plant and as before seniority would have first bid for the job. Kenneth Davis got that position and I was laid off. After I was laid off, Angie Curly came to that plant which she was working at plant 3 at the time and started working in my position. ████████████████████████████████████████████ ████████████████████████████████████████████ ████ Why did Angie work in my position now? Scott said the product was not selling so he had to let people go.

~~Roe ... David H. ... called him ...~~

~~Why ... he call me? I ... senior to Rob ...~~

There were times on the job when I was in pain because of my military injuries and Scott stated if I couldn't **walk** around then go home. We didn't need workers who couldn't do their job. I never had a moment where as I didn't or couldn't do my job, however there were maintenance men who rode on golf carts in and around the plant. I am seeking compensation for loss and damages.

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2007, a copy of this document was mailed to  Jack Rowe

2345 Grand Boulevard Suite 2800

Kansas City, Missouri 64108-2684



**DEPARTMENT OF VETERANS AFFAIRS**
Regional Office
345 Perry Hill Road
Montgomery AL 36109-3798

JUN 2 1997

QUINCY L ALEXANDER
1507 8TH PL SO
PHENIX CITY AL 36869

In Reply Refer To: 322/ZST
CSS 418 15 5479
ALEXANDER, Q L

Dear Mr. Alexander:

We have granted your claim for service connected disability compensation. Your combined evaluation is 40 percent. You have also been found to have a nonservice connected condition.

This combined rating is not arrived at by adding the percentages of your disabilities, but is computed in accordance with a combined rating table.

You are awarded benefits as follows:

| <u>Monthly Rate</u> | <u>Effective Date</u> |
|---|---|
| $391.00 | May 1, 1997 |

You are entitled to treatment by the Department of Veterans Affairs (VA) for any service connected disability. You may apply for treatment at the nearest VA office. If you apply in person, please present this letter. If you apply by letter, include your VA file number.

The enclosed rating decision on your claim states the reasons and bases for this decision, as well as the evidence considered.

 **Department of
Veterans Affairs**

418 15 5479
Q L Alexander

# DISABILITY COMPENSATION AWARD ATTACHMENT
# IMPORTANT INFORMATION

## VA CHECK DELIVERY
A check covering the initial amount due under this award will be mailed within 15 days. Thereafter, checks will be delivered at the beginning of each month for the preceding month.

## VA HOSPITALIZATION AND OUTPATIENT TREATMENT
You are entitled to priority admission to a VA hospital or to outpatient treatment for all service-connected conditions. A priority Patient Data Card which identifies you as being entitled to priority treatment may be obtained from your nearest VA health facility. If you have a service-connected disability or disabilities evaluated at 50% or more, you may also qualify for outpatient medical treatment for conditions not due to military service. Although the enclosed award letter is not an authorization for treatment, it will help you establish your entitlement and should be presented to the nearest VA Medical Center or Outpatient Clinic when you apply for the priority Patient Data Card or should the need for treatment arise before the card is received by you.

## DENTAL TREATMENT
If you are evaluated as 100% disabled for service-connected disabilities or as 100% disabled because of Individual Unemployability, you may be eligible for VA dental treatment. For additional information, contact your nearest VA Medical Center or Outpatient Clinic.

## ADDITIONAL COMPENSATION FOR DEPENDENTS
Veterans having a 30% or more service-connected condition may be entitled to additional compensation for a spouse, dependent parents, or unmarried children under 18 (or under 23 if attending an approved school) or when prior to age 18 the child has become permanently incapable of self-support because of mental or physical defect. The additional benefit for a spouse is payable in a higher amount upon receipt of evidence establishing that the spouse is a patient in a nursing home or so disabled as to require the aid and attendance of another person.

## INDIVIDUAL UNEMPLOYABILITY
If your service-connected disabilities are seriously disabling, but are not total and are not solely of a psychiatric nature, and you are unable to secure and follow a substantially gainful occupation because of those disabilities, you may be entitled to receive benefits at the rate for total disability. If you wish to claim this benefit, you should contact the nearest VA office and complete  21-8940, Veteran's Application for Increased Compensation Based on Unemployability.

## VOCATIONAL REHABILITATION
As a disabled veteran you may be eligible for the training and employment services provided under the vocational rehabilitation program. VA pays the full cost for tuition, fees and other services furnished and you receive a monthly payment to help you meet your regular living expenses. These benefits are in addition to any compensation or retirement pay. If your disability was incurred on or after September 16, 1940, and you are interested in this program or desire additional information, you should contact your nearest VA office.

## EDUCATIONAL BENEFITS
If you were discharged after January 31, 1955, you may be eligible for educational benefits in addition to compensation or retired pay. A monthly educational assistance allowance is payable to veterans who qualify for one of VA's educational assistance programs. Each program has unique eligibility specified by law, but only one program can be used at any given time. These programs are alternatives to the above-mentioned Vocational Rehabilitation. If you desire additional information, you should write or call the nearest VA office.

## NONASSIGNABILITY AND EXEMPT STATUS OF BENEFITS
Compensation payments are exempt from claims of creditors. With certain exceptions the payments are not assignable and are not subject to attachment, levy or seizure except as to claims of the United States.

## GOVERNMENT LIFE INSURANCE
If you are paying premiums on Government life insurance (GI insurance) and are unable to work, you may be entitled to certain benefits as provided for in your policy. For complete information contact the VA regional office where you pay premiums.

## CHANGE OF ADDRESS NOTICE
Please notify this office immediately, in writing over your signature, of any change of address.

## CONDITIONS AFFECTING RIGHT TO PAYMENT
1. Your award of disability compensation is subject to future adjustment upon receipt of evidence showing any change in the degree of disability.
2. Your payments may also be affected by any of the following circumstances which you must promptly call to our attention.
   a. Reentrance into active military or naval service.
   b. Receipt of armed forces service retirement pay, unless your retirement pay has been reduced because of award of disability compensation.
   c. Receipt of benefits from the Office of Federal Employees Compensation.
   d. Receipt of active duty or drill pay as a reservist or member of the Federally recognized National Guard.
3. If you have a disability rating of 30% or more, you must promptly advise us of any change in the status of your dependents.
4. If your award includes special monthly compensation due to need for aid and attendance, this additional allowance is generally subject to reduction from the first day of the second calendar month of admission to hospitalization, nursing home or domiciliary care at VA expense.
5. Benefits will be reduced upon incarceration in a Federal, State or local penal institution in excess of 60 days for conviction of a felony. The amount not payable may be apportioned to a spouse, dependent children or parents.
6. Monthly payments of your award may be stopped, if you fail to furnish evidence as requested; fail to cooperate or submit to a VA examination when requested; or if you furnish VA or cause to be furnished any false or fraudulent evidence.
7. Information submitted is subject to verification through computer matching programs with other agencies.
8. The law provides severe penalties which include fine or imprisonment, or both, for the fraudulent acceptance of any payment to which you are not entitled.

 **Department of
Veterans Affairs**

418 15 5479
Q L Alexander

IMPORTANT INFORMATION ABOUT VOCATIONAL REHABILITATION BENEFITS
*(ATTACHMENT TO VA FORM 28-1900)*

If you are a veteran with a service-connected disability or disabilities which VA has rated at least 20 percent disabling, you may be eligible for the Department of Veterans Affairs program of vocational rehabilitation.

The training and other services which this program provides can help you prepare for and obtain a good job. If you are too seriously disabled to train for employment, VA may also provide services to help you to learn to live more independently. This program's benefits are in addition to any VA compensation or military retirement benefits you are entitled to receive.

If VA finds you eligible for this program, a VA counselor will meet with you to evaluate your needs for educational and vocational training, employment assistance, and services and assistance to help you to live more independently. Based on this evaluation, the counselor and others will work with you to develop a plan of training and services to prepare you for employment.

In a vocational rehabilitation program, you may attend a college, university, or vocational school or pursue an on-farm, on-job, or apprenticeship program. VA may even arrange to provide training and assistance in your own home or in special facilities if your disability prevents you from attending regular facilities in the community.

VA will pay the costs of your training and other services. While you are training and for 2 months after you complete a training program, VA will pay you a monthly living allowance. VA will also arrange for any medical or special assistance you need to finish your rehabilitation program.

After you complete any needed training, VA will help you find a job. You may also receive job assistance without training if VA finds that you only need this assistance to obtain a suitable job.

Generally, you must complete a rehabilitation program within 12 years from the date VA notifies you that you are entitled to compensation at the 20-percent rate or higher. Under certain conditions, this period may begin at an earlier date or may be extended.

If you are interested in vocational rehabilitation or would like to come in to discuss the opportunities the program offers, please complete and forward to us the enclosed application, VA Form 28-1900, Disabled Veterans Application for Vocational Rehabilitation. Sending us this form does not obligate you in any way nor will it affect any VA compensation, other VA education benefits, or military retirement pay you may receive.

2

CSS 418 15 5479
Alexander, Q L

Please see the enclosed VA Form 4107 which explains your procedural and appellate
rights.

Sincerely yours,

T. M. DOWNES
Adjudication Officer

Enclosure(s):  VA Form 4107
              Rating Decision
              VA Form 21-8764
              VA Form 28-8890
              VA Form 28-1900


ZST/170  JD

| **lating Decision** | *Department of Veterans Affairs*<br>*Montgomery Regional Office* | | Page 1<br>06/16/97 |
|---|---|---|---|
| ME OF VETERAN<br>)UINCY L. ALEXANDER | VA FILE NUMBER<br>418 15 5479 | SOCIAL SECURITY NR | POA |

## ISSUE:

1. Service connection for bilateral hearing loss.
2. Service connection for tinnitus.
3. Service connection for hypertension.
4. Service connection for mechanical low back pain. ←
5. Service connection for right osteochondral defect medial femoral condyle for large osteochondral defect with history of stress fracture right tibia.
6. Service connection for status post osteochondral defect lesion medial femoral condyle, left knee. ←

## EVIDENCE:

Service medical records for the period November 22, 1988 to January 14, 1997
VA examinations dated May 20, 1997, VA Medical Center, Montgomery

## DECISION:

1. Service connection for bilateral hearing loss is granted with an evaluation of 0 percent effective April 14, 1997.
2. Service connection for tinnitus is granted with an evaluation of 10 percent effective April 14, 1997.
3. Service connection for hypertension is denied.
4. Service connection for mechanical low back pain is granted with an evaluation of 10 percent effective April 14, 1997.
5. Service connection for right osteochondral defect medial femoral condyle for large osteochondral defect with history of stress fracture right tibia is granted with an evaluation of 10 percent effective April 14, 1997.
6. Service connection for status post osteochondral defect lesion medial femoral condyle, left knee is granted with an evaluation of 10 percent effective April 14, 1997.

## REASONS AND BASES:

1. Service connection for bilateral hearing loss has been established as directly related to military service. This condition is evaluated as 0 percent disabling from April 14, 1997. Hearing loss is evaluated as 0 percent disabling whenever the percentage of discrimination in one ear is between 92 and 100 with an average puretone decibel loss less than 42, and discrimination percentage in the other ear is between 92 and 100 with average puretone loss less than 42. Examination findings show 100 percent discrimination and a decibel loss of 40 in the right ear, with 96 percent discrimination and a decibel loss of 35 in the left ear. Higher evaluations are assigned for greater loss of hearing.

Enlistment examination dated November 1988, shows normal hearing in right ear. The examination shows hearing in the left ear as follows: 500 decibel range at 5; 1000 decibel range at 5; 2000 decibel range at 0;

| **Rating Decision** | *Department of Veterans Affairs*<br>*Montgomery Regional Office* | | Page 2<br>06/16/97 |
|---|---|---|---|
| NAME OF VETERAN<br>QUINCY L. ALEXANDER | VA FILE NUMBER<br>418 15 5479 | SOCIAL SECURITY NR | POA |

3000 decibel range at 15; and 4000 decibel range at 50. Separation examination dated January 1997, shows normal hearing in the right ear. The examination shows hearing in the left ear as follows: decibel range 500 at 5; decibel range 1000 at 35; decibel range 2000 at 35; decibel range 3000 at 45; and decibel range 4000 at 60.

Results of VA audiological examination shows a moderate sensorineural hearing loss in the right ear and a mild sensorineural hearing loss in the left ear.

2. Service connection for tinnitus has been established as directly related to military service. This condition is evaluated as 10 percent disabling from April 14, 1997. An evaluation of 10 percent is granted if the record shows persistent tinnitus as a symptom of head injury, concussion, or acoustic trauma.

The veteran's position while in the military was a petroleum supply specialist. At the VA examination, the veteran reported he was around heavy equipment all the time. He stated he started having tinnitus while in the army. He states it is bilateral, constant and describes it as a mid pitch hum, not too loud.

3. The law provides that a person who submits a claim for VA benefits must submit evidence sufficient to justify a belief that the claim is well grounded. A well-grounded claim is a plausible claim, one which has merit on its own, or is capable of substantiation. Such a claim need not be conclusive, but it must be accompanied by evidence which shows that the claimed condition exists and is possibly related to service.

A well grounded claim for service connection requires evidence of a current disability, evidence of incurrence or aggravation of a disease or injury in the service, and evidence of a nexus, or link, between the in-service injury or disease and the current disability. There is no record of hypertension showing a chronic disability subject to service connection. In order to establish a well-grounded claim, it is necessary to provide evidence which demonstrates the existence of the claimed condition and its possible relationship to service.

Enlistment examination dated November 1988, shows the veteran's blood pressure as 110/70. Separation examination dated January 1997, shows the veteran's blood pressure as 139/71. There is no record of treatment for high blood pressure shown in the veteran's service medical records.

At the VA examination, the veteran stated he has had high blood pressure for about three years and has never been on medications. Blood pressure readings were 150/81, 156/86, 142/58, 113/66, 122/70, 132/92, 118/80, 119/82, and 130/78. The examiner states hypertension, not established.

4. Service connection for mechanical low back pain has been established as directly related to military service. This condition is evaluated as 10 percent disabling from April 14, 1997. An evaluation of 10 percent is granted for characteristic painful or limited motion. A higher evaluation of 20 percent is not warranted unless evidence demonstrates muscle spasm on extreme forward bending and unilateral loss of lateral spine motion in a standing position.

| **Rating Decision** | *Department of Veterans Affairs* *Montgomery Regional Office* | | Page 3 06/16/97 |
|---|---|---|---|
| NAME OF VETERAN QUINCY L. ALEXANDER | VA FILE NUMBER 418 15 5479 | SOCIAL SECURITY NR | POA |

Enlistment examination dated November 1988, shows the spine, other musculoskeletal system as normal. Service medical record dated August 1996, shows the veteran was treated for low back pain. Diagnosed mechanical low back pain. Separation examination dated January 1987, shows the veteran complained of low back pain.

At the VA examination, the veteran complained of low back pain. Examination showed no spasm or deformity. He can walk on heels, walk on toes, and squat to 135 degrees. He walks without a limp. Range of motion was flexion to 95 degrees; extension to 35 degrees; lateral flexion to 40 degrees bilaterally; and rotation to 35 degrees bilaterally. There was no functional loss due to pain. X-ray findings of the lumbosacral spine were normal. Diagnosed low back strain.

5. Service connection for right osteochondral defect medial femoral condyle for large osteochondral defect with history of stress fracture of the right tibia has been established as directly related to military service. This condition is evaluated as 10 percent disabling from April 14, 1997. An evaluation of 10 percent is assigned for symptomatic removal of the semilunar cartilage.

Enlistment examination dated November 1988, shows the veteran's lower extremities as normal. Service medical record dated February 1991, shows the veteran complained of bilateral knee pain resulting from a fall on ice. The examiner diagnosed contusion/strain bilateral knees. In July 1991, a diagnostic arthroscopy excision and drilling of an osteochondral defect and fragment of the right knee was performed. Treatment record dated June 1993, shows the veteran was treated for pain in both legs, right leg pain in mid shaft and posterior calf and left leg pain in bottom of calf running into foot. Diagnosed shin splints. X-ray findings dated December 1993, shows lucent line with overlying cortisal thickening anterior lateral aspect of tibia mid-shaft which represents a healing stress fracture.

At the VA examination, the veteran indicates his knees hurt all the time. Range of motion is 0 degrees to 140 degrees, bilaterally. X-ray findings of the knees were normal. Diagnosed status post arthroscopic surgery of both knees with minimal function loss and status post stress fracture right tibia with no functional loss.

6. Service connection for status post osteochondral defect lesion medial femoral condyle, left knee has been established as directly related to military service. This condition is evaluated as 10 percent disabling from April 14, 1997. An evaluation of 10 percent is assigned for symptomatic removal of the semilunar cartilage.

Service medical record dated September 1992, shows the veteran complained of an injured left knee. Treatment record dated August 1996, shows the veteran was treated for left knee pain. X-ray findings dated October 1996, shows osteochondral defect lesion medial condyle. Treatment records indicate an osteochondral defect drilling was performed on the veteran's left knee. At the VA examination, the veteran indicates his knees hurt all the time. Range of motion is 0 degrees to 140 degrees, bilaterally. X-ray findings of the knees were normal. Diagnosed status post arthroscopic surgery of both knees with minimal function loss.



**DEPARTMENT OF VETERANS AFFAIRS**
VA Regional Office
345 Perry Hill Road
Montgomery AL  36109

JUL J   2000

QUINCY L ALEXANDER
1507 8TH PL S
PHENIX CITY AL 36869

In Reply Refer To:  322/21T4
CSS 418 15 5479
ALEXANDER, Q L

Dear Mr. Alexander:

We made a decision on your claim for an increase in your service connected left knee disability, right knee disability, and scars.  We also extended your period of convalescence which entitles you to a temporary total evaluation.

## What We Decided

We found the following disabilities have increased in severity.  Here are the conditions and the evaluation for each:

Your right knee disability which was 10% has increased to 20% disabling.

Your left knee disability which was 10% has increased to 20% disabling.

Your scars which was 0% has increased to 10% disabling.

Your overall or *combined* evaluation is 60%.  The percentages of your individual disabilities may not add up to your overall evaluation.  We use a "combined rating table" to decide how disabled you are.  The percentages in this table are set by regulation.

We extended your period of convalescence and temporary total evaluation until May 1, 2000.

## How We Made Our Decision

We carefully considered the evidence we received which includes VA examination done at the Montgomery VA medical center and kinesiotherapy reports from the Tuskegee VA medical center.  We have attached a copy of the rating decision.

## Your Monthly Compensation

Your monthly compensation is shown below.  Please understand that the law (38 U.S.C. 5111) says payments must begin the first day of the month after you've become entitled to the benefit.

| **Rating Decision** | *Department of Veterans Affairs*<br>*Montgomery Regional Office* | | Page 1<br>07/07/2000 |
|---|---|---|---|
| NAME OF VETERAN<br>QUINCY L. ALEXANDER | VA FILE NUMBER<br>418 15 5479 | SOCIAL SECURITY NR<br>4⬛⬛⬛⬛⬛ | POA<br>American Legion |

## ISSUE:

1. Entitlement to a temporary total evaluation because of treatment for a service-connected condition requiring convalescence. (38 CFR 4.30)
2. Evaluation of scars currently evaluated as 0 percent disabling.
3. Evaluation of right knee disability currently evaluated as 10 percent disabling.
4. Evaluation of left knee disability currently evaluated as 10 percent disabling.

## EVIDENCE:

VA examination dated June 12, 2000, conducted at the Central Alabama Veterans Health Care System (CAVHCS), West Campus, Montgomery, AL.
Kinesiotherapy reports from CAVHCS, East Campus, Tuskegee, AL, for the period February 16 to May 31, 2000.

## DECISION:

1. An evaluation of 100 percent has been assigned for the period January 5, 2000 to May 1, 2000 based on surgical or other treatment necessitating convalescence.
2. Evaluation of scars, which is currently 0 percent disabling, is increased to 10 percent effective December 6, 1999.
3. Evaluation of right knee disability, which is currently 10 percent disabling, is increased to 20 percent effective December 6, 1999.
4. Evaluation of left knee disability, which is currently 10 percent disabling, is increased to 20 percent effective December 6, 1999.

## REASONS AND BASES:

1. An evaluation of 100 percent has been assigned effective January 5, 2000 based on surgical or other treatment necessitating convalescence.

The veteran was admitted to the VA Medical Center, Birmingham, AL, on January 5, 2000, with complaints of knee pain. Assessment was bilateral osteochondral defect. He underwent right mosaic-plasty without complications and was discharged for physical therapy. Postoperatively good progress was noted in physical therapy. Physical therapy reports from CAVHCS, East, showed the veteran ambulating with a cane until April 11, 2000, at which time he was discharged from therapy.

VA examination shows the veteran ambulating with a limp. He was able to stand on his heels and toes. He was unable to do a full squat. There was no ankylosis present. There was a moderate amount of crepitus with range of motion of both knees. His range of motion of the right knee was 0 to 110 degrees of flexion

| **Rating Decision** | *Department of Veterans Affairs*<br>*Montgomery Regional Office* | | Page 2<br>07/07/2000 |
|---|---|---|---|
| NAME OF VETERAN<br>QUINCY L. ALEXANDER | VA FILE NUMBER<br>418 15 5479 | SOCIAL SECURITY NR<br>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 | POA<br>American Legion |

with a moderate amount of pain. Recent x-rays had shown osteoarthritis of the right knee. Diagnosis was osteoarthritis of the knees bilaterally with moderate limitation due to pain.

2. The evaluation of scars is increased to 10 percent disabling effective December 6, 1999, the date of receipt of reopened claim. An evaluation of 10 percent is granted for scarring which is tender and painful on objective demonstration.

VA examination shows the veteran has on his left ear a 2 cm by 1 cm linear keloid scar of skin color that is nontender to touch. It is extremely firm and nodular and there is a deformity of the left ear lobe. On the right knee, he has a 13 cm by 2.5 cm hyperpigmented linear scar on the medical aspect which is rough to touch. It is tender to touch. The scar is elevated and there is no underlying tissue loss. It is quite disfiguring to the knee. Diagnosis was scars with a moderate amount of disfiguring pain.

3. The evaluation of right knee disability is increased to 20 percent disabling effective December 6, 1999. An evaluation of 20 percent is granted whenever the semilunar cartilage is dislocated with frequent episodes of "locking," pain, and effusion into the joint.

VA examination shows the veteran ambulating with a limp. He was able to stand on his heels and toes. He was unable to do a full squat. There was no ankylosis present. There was a moderate amount of crepitus with range of motion of both knees. His range of motion of the right knee was 0 to 110 degrees of flexion with a moderate amount of pain. Recent x-rays had shown osteoarthritis of the right knee. Diagnosis was osteoarthritis of the knees bilaterally with moderate limitation due to pain.

4. The evaluation of left knee disability is increased to 20 percent disabling effective December 6, 1999, the date of receipt of reopened claim. An evaluation of 20 percent is granted whenever the semilunar cartilage is dislocated with frequent episodes of "locking", pain, and effusion into the joint.

VA examination showed the veteran was able to stand on his heels and toes. He did complain of weakness in the left knee in doing so. He is unable to do a full squat. There was a moderate amount of crepitus with range of motion of both knees. Flexion of the left knee was 0 to 140 degrees with mild limitation due to the pain. There was mild medial instability of the left knee. McMurray's was positive for the left knee. Diagnosis was osteoarthritis of the knees bilaterally with moderate limitation due to pain.

2

CSS 418 15 5479
Alexa, Q L

in approximately 15 days.  Payment will then be made at the beginning of each month for the
prior month.  For example, benefits due for May are paid on or about June 1.

## What Did We Decide?

We determined that the following service connected condition(s) has/have worsened, so we
granted an increase in your assigned percentage:

| Medical Description | Old Percent (%) Assigned | New Percent (%) Assigned | Effective Date |
|---|---|---|---|
| Lumbosacral strain | 10% | 40% | Jun 8, 2006 |

We determined that the following service connected condition(s) hasn't/haven't changed:

| Medical Description | Percent (%) Assigned |
|---|---|
| Left knee disability, status post osteochondral defect lesion, medial femoral condyle, left knee | 20% |
| Right knee disability, right osteochondral defect, medial femoral condyle, with history of stress fracture, right tibia | 20% |
| Tinnitus | 10% |
| Hearing loss | 0% |
| Scars, status post keloid removal, left ear | 10% |

Entitlement to Individual Unemployability is denied.

Your overall or combined rating is 70%.  We do not add the individual percentages of each
condition to determine your combined rating.  We use a combined rating table that considers
the effect from the most serious to the least serious conditions.

We have enclosed a copy of your Rating Decision for your review.  It provides a detailed
explanation of our decision, the evidence considered and the reasons for our decision.  You



**DEPARTMENT OF VETERANS AFFAIRS**
**REGIONAL OFFICE COLUMBIA**
**1801 ASSEMBLY STREET**
**COLUMBIA, SC 29201**

**QUINCY L. ALEXANDER**

**VA File Number**
**418 15 5479**

**Represented by:**
**DISABLED AMERICAN VETERANS**

**Rating Decision**
**February 22, 2007**

## INTRODUCTION

The records reflect that you are a veteran of the Peacetime and Gulf War Era. You served in the Army from August 2, 1989 to December 15, 1989, and from October 18, 1990 to April 13, 1997. You filed a new claim for benefits that was received on June 8, 2006. Based on a review of the evidence listed below, we have made the following decisions on your claim.

## DECISION

1 . Evaluation of lumbosacral strain, which is currently 10 percent disabling, is increased to 40 percent effective June 8, 2006.

2 . Evaluation of left knee disability, status post osteochondral defect lesion, medial femoral condyle, left knee, which is currently 20 percent disabling, is continued.

3 . Evaluation of right knee disability, right osteochondral defect, medial femoral condyle, with history of stress fracture, right tibia, which is currently 20 percent disabling, is continued.

QUINCY L. ALEXANDER
418 15 5479
Page 2

4 . Evaluation of tinnitus, which is currently 10 percent disabling, is continued.

5 . Evaluation of hearing loss, which is currently 0 percent disabling, is continued.

6 . Evaluation of scars, status post keloid removal, left ear, which is currently 10 percent disabling, is continued.

7 . Entitlement to individual unemployability is denied.

## EVIDENCE

- VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability received June 8, 2006
- The Duty to Assist/VCAA letter dated November 28, 2006, was sent to you which informed you of your rights in the VA claims process and of the evidence required to establish entitlement to the requested benefit.
- VA Form 21-4192, Request for Employment Information in Connection with Claim for Disability Benefits from Boral Bricks, Inc., received December 7, 2006
- Medical statement from Alexander N. Doman, M.D. dated April 11, 2006
- Letter from the United States Office of Personnel Management dated August 4, 2006
- VA audio examination, VA Medical Center, Montgomery, AL, dated December 15, 2006
- VA general medical examination, VA Medical Center, Montgomery, AL, dated December 16, 2006

## REASONS FOR DECISION

### 1.  Evaluation of lumbosacral strain currently evaluated as 10 percent disabling.

You submitted a claim for entitlement to individual unemployability which is considered a claim for an increase in all service connected disabilities. We have increased your service connected lumbosacral strain to 40 percent effective June 8, 2006, because your disability is shown to be so severe as to meet the criteria for the next higher evaluation.

The medical statement from Alexander N. Doman, M.D., dated April 11, 2006, shows your history of low back pain, but did not show an increase in symptomatology of your service connected disability. According to the VA general medical examination conducted at the VA Medical Center, Montgomery, AL on December 16, 2006, you have constant pain, stiffness, and weakness of the lumbar spine. You currently treat the condition with medication, although the effectiveness is poor. You denied periods of incapacitation within the last 12-month period. Examination of the lumbar spine showed tenderness upon palpation, but no muscle atrophy, scars or redness. Range of motion showed flexion of 5 degrees limited by pain, extension of 15 degrees limited by pain,